# Exhibit 3



# Transcript of Peter Hicks

**Date:** March 30, 2026
**Case:** Horchow -v- The Westmoor Club, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

REGEN HORCHOW,                )
                             )
     Plaintiff,              )
                             ) CIVIL ACTION
VS.                          )
                             ) NO.: 1:25-CV-11008-WGY
THE WESTMOOR CLUB, LLC,      )
                             )
     Defendant.              )

-----------------------------------

ORAL DEPOSITION OF

PETER HICKS

MARCH 30, 2026

TAKEN VIA ZOOM VIDEOCONFERENCE

-----------------------------------

JOB NO.: 627414

PAGES: 1 - 60

REPORTED STENOGRAPHICALLY BY:

ANNETTE PELTIER, CSR, CRR

ORAL DEPOSITION OF PETER HICKS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on March 30, 2026, from 8:31 a.m. Central Standard Time to 9:58 a.m., before Annette Peltier, CSR, Texas Certified Realtime Reporter, in and for the State of Texas, reported by machine shorthand pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

           A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:

        JOHN L. GAVIN, ESQUIRE
        HAYLEY TRAHAN-LIPTAK, ESQUIRE
        K&L GATES LLP
        One Congress Street
        Suite 2900
        Boston, MA 02114
        617.261.3100


ON BEHALF OF THE DEFENDANT:

        TYLER E. CHAPMAN, ESQUIRE
        Todd & Weld, LLP
        One Federal Street
        Boston, MA 02110
        617.720.2626

Index
                                                  Page

Appearances............................   3

Examination by Mr. Gavin...............   5

Adjournment............................   57

Signature Page.........................   58

Court Reporter's Certificate...........   59

Exhibits
Number      Description                   Page

Exhibit 1   The Westmoor Club 2004
            Membership Plan...............  21

Exhibit 2   Membership Application........  40

* * * * *

THE COURT REPORTER:  Mr. Gavin, I have that you want this final tomorrow.  Is that correct?

MR. GAVIN:  I don't know that we need the final tomorrow.  If we could just have a rough.  I think by the end of the week would probably be fine.

THE COURT REPORTER:  Thank you for confirming that.

PETER HICKS,

Having been first duly sworn, testified upon his oath as follows:

EXAMINATION

BY MR. GAVIN:

Q.  Good morning, Mr. Hicks.  We met just a moment ago.  My name's John Gavin.  I represent Ms. Regen Horchow in this matter.

Could you please introduce yourself for the record?

A.  Yes, Peter Hicks.  Home residence, Nantucket, Massachusetts.

Q.  And, Mr. Hicks, have you ever been deposed before?

A.  No, I have not.

Q. Okay. Annette just went over some of the basic ground rules, but, you know, as she mentioned, it's important that I finish my question, you finish your answer, and we don't talk over each other.

I'll do my best to be mindful of letting you complete your answer before I jump in with a question, and I just ask you to do the same for my questions.

A. Understood.

Q. It's also important, especially because we do not have a videographer for this deposition, that you give verbal responses; so a "yes" or a "no" as opposed to a shake of the head or a nod.

Do you understand that?

A. Yes.

Q. Okay. If you don't understand a question or you can't hear it, I'd just ask if you please ask me to either repeat it or rephrase. If you answer a question, I will assume that you understood it. Is that fair?

A. Yes.

Q. Okay. As I said earlier, I don't envision this being a particularly long deposition, but

08:43:03
08:43:07
08:43:09
08:43:12
08:43:14
08:43:16
08:43:20
08:43:21
08:43:24
08:43:26
08:43:26
08:43:29
08:43:31
08:43:35
08:43:38
08:43:38
08:43:39
08:43:42
08:43:47
08:43:51
08:43:53
08:43:54
08:43:54
08:43:59

if you need to take a break, we're happy to take
a break at any time that you would like.  I
would just ask that you answer any outstanding
questions before we take a break.

A.  Understood.

Q.  Okay.  And Mr. Chapman may object at
various points during the deposition.  Unless he
instructs you not to, you should answer even if
the objection has been made.  It's to preserve
an objection for the future.

Do you understand that?

A.  Yes.

Q.  Okay.  If I use the term "Regen" or
"Ms. Horchow" during the deposition, that's
referring to my client, Ms. Regen Horchow.

You may or may not remember when her
name was previously Regen Fearon.  Is that fair,
and you understand that reference?

A.  Yes.

Q.  Okay.  I also throughout the deposition
will be referring to the membership, and we'll
get into the details of that -- of the
membership application from 2004; but if I refer
to "the membership," do you understand that I'm

referring to the membership that was given to
the club as a result of this application that
we'll be looking at?

A.  Yes.

Q.  Okay.  And finally, if I just refer to the
Westmoor Club as "the club," do you understand
that?

A.  Yes.

Q.  Okay.  With that out of the way, did you
do anything to prepare for today's deposition?

A.  I spoke with Tyler.

Q.  Okay.  Without revealing the substance of
that conversation, how long did you speak to
Mr. Chapman?

A.  I spoke with him probably 15 minutes on
Friday and about five minutes this morning, and
then I also spoke with Alan Worden on Friday, I
believe, for about 15 minutes regarding this and
then probably 15 minutes just catching up on
personal stuff.

Q.  Okay.  Was Mr. Chapman on that call with
Mr. Worden?

A.  He was not.

Q.  Okay.  What did you discuss about this

deposition with Mr. Worden?

A. I just informed him that I had received Hayley's attempt to reach me while I was out of the country and told him that I was being deposed and did he -- he have any advice or insight for me on the fact that I was being deposed.

Q. Did Mr. Worden give you any advice or insight?

A. He just gave me a little background on what was going on but didn't really give me any advice, per se.

Q. Okay. What do you recall Mr. Worden telling you about what was going on?

A. He just said that there -- the Horchows were bringing suit against the club for some -- I guess they were getting divorced and trying to figure out who was the member -- who would stay the member through the divorce.

Q. Okay. Do you recall anything else that Mr. Worden may have told you about the dispute?

A. No.

Q. Okay. Have you ever spoken to Ms. Horchow about this dispute?

A.  No.

Q.  Okay.  Have you ever spoken to Jeffrey Fearon about this dispute?

A.  No.

Q.  Okay.  Have you ever spoken to either of them, to your recollection?

A.  No, I have not.

Q.  Okay.  Could you briefly describe your education background?

A.  I went to public high school in Greenwich, Connecticut, and then graduated from the University of Virginia.

Q.  Okay.  And then at a high level, your employment history?

A.  My first job out of college was I was an officer in the Marine Corps and then predominantly involved in sales and marketing, and then in my last career I was involved in doing some business consulting.

Q.  I know you mentioned at the outset of this deposition that you live on Nantucket.  How long have you lived on Nantucket?

A.  Since 2004.

Q.  Okay.  Did you have a connection to

08:47:25
08:47:26
08:47:28
08:47:29
08:47:30
08:47:33
08:47:35
08:47:35
08:47:40
08:47:43
08:47:47
08:47:49
08:47:50
08:47:57
08:47:59
08:48:02
08:48:06
08:48:09
08:48:13
08:48:20
08:48:24
08:48:27
08:48:29
08:48:30

Nantucket prior to 2004?

A. I worked at the White Elephant Hotel in the summer of 1982.

Q. Okay. Was that in a sort of sales and marketing role as you described?

A. No. I worked at the pool.

Q. Okay. Just a summer job?

A. Yes.

Q. Okay. When did you first learn about the Westmoor Club?

A. Shortly after we moved to Nantucket in May of 2004.

Q. Okay. How did you become aware of the club?

A. The realtor who sold us our house was a friend of -- well, was the son of a friend of the Goldsmiths, and they were encouraging us to become members, which we could not do financially; and then shortly after that, I saw a classified ad in the local newspaper advertising for the position.

Q. And what position was that?

A. I believe the title was director of membership.

08:48:32
08:48:34
08:48:37
08:48:39
08:48:43
08:48:44
08:48:46
08:48:50
08:48:50
08:48:57
08:48:58
08:49:02
08:49:02
08:49:05
08:49:07
08:49:11
08:49:15
08:49:19
08:49:23
08:49:26
08:49:32
08:49:35
08:49:38
08:49:40

Did I read that first part of the "Eligibility for membership" provision correctly?

A. Yes.

Q. All right. So you agree that the club's membership plan states that membership is available only to individuals that the club approves, right?

A. Oh, I -- I'm -- I'm reluctant to -- to -- to answer questions based on contractual language. I'm not an expert in -- in contracts.

Q. Fair enough.

During your employment at the club, do you recall anyone being admitted to the membership who did not complete a membership application?

A. Not to my knowledge.

Q. Okay. Do you recall anyone being approved to the -- or being admitted as a member that the club did not approve?

MR. CHAPMAN: Objection.

You can answer.

A. No, I don't recall.

Q. (BY MR. GAVIN) Okay. And do you recall

the interview's sole decision whether to admit a
member or not?

A. Oh, I don't know whether they collaborated
or communicated with each other. Yeah, that
would be a better question for them.

Q. Okay. So the decision to admit a member
was made by either one or multiple of the three
principals we discussed?

A. Correct.

Q. Okay. Did you or any of the other members
of your team have any involvement in that
decision?

A. No.

Q. Okay. Once the principals made a decision
about whether or not to admit a member, do you
recall how that decision was communicated to you
or your team?

A. I'm going to have to say no -- no.

Q. Okay. Do you recall the decision to admit
a prospective member being communicated to you
or your team?

A. It would have been communicated to one of
us. I just -- the reason I was hesitating on
the previous question is I don't recall whether

they just told us verbally or whether they --
whether there was a -- some type of written
communication.  I just don't remember.  Sorry.

Q.  Okay.  No, no problem.  It's been a while
since 2004.

To your recollection, would there be a
reference to a particular application number or
an individual by name when the principals
decided to admit a prospective member?

A.  I don't -- I don't think we had membership
numbers at that stage.  If I'm not mistaken, the
actual membership numbers only came into play
after the club was operational and you had a --
in different clubs they called them audit
numbers, but I don't think we had membership
numbers at the outset.

Q.  Okay.  Do you recall whether the
principals would refer to prospective members
who they had approved for admission by name,
then?

A.  No, I don't recall.

Q.  Okay.  Did you maintain any documents
or -- tracking or identifying members who had
been admitted by the principals?

A.   We had an Excel spreadsheet that was created before I was hired that the team maintained, if I'm -- if I'm not mistaken, to -- I think its primary purpose was to track payments, but I -- I -- I don't recall the details.

Q.   What type of information do you recall being contained on that spreadsheet for an admitted member?

A.   Yeah, I don't recall.

Q.   Okay.  Do you recall whether the spreadsheet contained the admitted member's name?

A.   I would assume it had to.

Q.   Okay.  Do you recall whether it contained the address of the admitted member?

A.   I don't recall.

Q.   Okay.  Do you recall whether it contained information about any deposits made by the admitted member?

A.   I believe so, but I'm not 100 percent sure.

Q.   Okay.  Do you recall where that Excel was kept or saved during your time?

Q.   Okay.   What is it?                          09:31:47

A.   It says:   "Membership Application."        09:31:49

Q.   Do you see the handwritten notations on      09:31:51
sort of the right side, starting at the top and   09:32:02
going all the way down to the bottom?             09:32:05

A.   Yes.                                          09:32:07

Q.   Okay.   What does the first handwritten      09:32:07
notation at the top say?                          09:32:11

A.   I kind of -- the very top one in blue ink    09:32:20
is very hard to read.                             09:32:24

Q.   Does my making the document larger help at   09:32:31
all with that first handwritten notation in blue  09:32:34
ink?                                              09:32:37

A.   Well, it looks like to me it's              09:32:37
F-E-D-R-O-N.                                       09:32:42

Q.   Okay.   And the -- the "D" you're referring  09:32:48
to looks a bit like a triangle; is that right?    09:32:51

A.   Yes.                                          09:32:56

Q.   Okay.   What about the black handwriting     09:32:56
directly below that?                              09:32:59

A.   That's very much clearer, and that's         09:33:01
"Fearon, Regen."                                   09:33:03

Q.   Okay.   Do you recognize either of those     09:33:04
handwritings?                                      09:33:08

A.   The black ink looks like mine.  The blue          09:33:09
ink does not look familiar.          09:33:12

Q.   Okay.  I'll scroll down a bit.          09:33:14

Just to the right of the title          09:33:17
"Membership Application," there's another          09:33:20
handwritten notation.          09:33:22

Can you read that?          09:33:23

A.   It says:  "Regular 125K level."          09:33:24

Q.   Okay.  And that's in black ink, as well?          09:33:30

A.   Correct.          09:33:32

Q.   Does this also look like your handwriting?          09:33:32

A.   That does, yes.          09:33:39

Q.   Okay.  Would you have made notations like          09:33:41
these black ink handwriting on membership          09:33:43
applications in 2004?          09:33:46

A.   Well, apparently I did on this one.          09:33:47

Q.   Do you have a recollection of why you          09:33:49
would have made notations on a membership          09:33:53
application?          09:33:56

A.   No, I don't recall.          09:33:58

Q.   Okay.  Do you recall what "regular 125K          09:33:59
level" would refer to?          09:34:07

A.   Well, there were three levels of          09:34:11
membership.  There was a founder membership, a          09:34:14

regular membership, and an island membership. 09:34:17

So this application was submitted as a regular 09:34:21

membership application; and at the time it was 09:34:27

submitted, the cost of the membership was 09:34:32

$125,000. 09:34:35

Q. Okay. Scrolling down to the very bottom 09:34:39

of the first page, in the lower right-hand 09:34:42

corner there's another handwritten notation, "10 09:34:45

August 2004." 09:34:50

Do you see that? 09:34:51

A. Yes. 09:34:51

Q. Is that your handwriting, as well? 09:34:52

A. Yes. 09:34:54

Q. Do you recall your practice with respect 09:34:55

to noting dates on membership applications in 09:35:03

2004? 09:35:06

A. No, I don't recall. 09:35:06

Q. Okay. Do you recall whether this would be 09:35:07

the date that the application was received or 09:35:12

the date that it was approved? 09:35:14

A. I don't recall. 09:35:17

Q. Okay. Turning your attention to the 09:35:18

second page, do you recall reviewing this 09:35:22

particular membership application? 09:35:28

Q. (BY MR. GAVIN) Okay. So the member would be the -- listed as the applicant here?

A. I'm not sure I understand that.

Q. Well, so at this point, when they were filling out this paperwork, the individual would not have been admitted to the club, right?

A. Correct.

Q. And so you said at this point the member would be an applicant; is that right?

A. A prospective member at this stage was the applicant.

Q. Turning to the next page of the application, there's a section at the top for company name and contact information; is that right?

A. Yes.

Q. And it appears to be blank on this application?

A. Correct.

Q. Okay. There's notations of not applicable on the first two lines?

A. Correct.

Q. And then the section below that is for billing and newsletter mailing addresses; is

Q. And it's the amount of $50,000?          09:45:53

A. Correct.          09:45:56

Q. Do you recall what the membership deposit          09:45:56
was in 2004 for a regular membership?          09:46:02

A. I do -- I do not.          09:46:07

Q. Do you see at the top of the check some          09:46:08
handwritten notation in black ink?          09:46:13

A. Yes.          09:46:15

Q. That notation reads:  "For Regen Fearon,          09:46:15
regular, and Elizabeth Routman, regular," right?          09:46:24

A. Correct.          09:46:27

Q. Is that your handwriting?          09:46:28

A. Yes.          09:46:30

Q. As part of your job as director of          09:46:30
membership, did you receive checks for          09:46:39
membership deposits?          09:46:42

A. Yes.          09:46:43

Q. Were those checks received with a          09:46:44
completed application for membership or after an          09:46:48
admission decision was made?          09:46:50

          MR. CHAPMAN:  Objection.          09:46:52

          Go ahead.          09:46:53

A. I don't recall.          09:46:54

Q. (BY MR. GAVIN)  Okay.  Do you recall your          09:46:55

practice with respect to making notations like this on checks that you received?

A.  No, I don't recall.

Q.  Okay.  If we scroll back up to the top of the page, there is another handwritten notation at the top.

Do you see that?

A.  Yes.

Q.  And it reads, "For Fearon, Regen, same check as for Routman, Lizzie."

Did I read that correctly?

A.  Yes.

Q.  Is this your handwriting, as well?

A.  Yes.

Q.  Do you recall whether, as part of reviewing membership applications, you would make copies of the checks that were received?

A.  I don't recall.

Q.  All right.  Does it appear that this is a photocopy of the check that you received from Roger Horchow?

A.  Well, the -- the check that I had just reviewed looked like a photocopy, but I don't know who made the photocopy.

A.   Yes.

Q.   And the check we looked at previously was for $50,000, right?

A.   Yes.

Q.   And that was for, as you noted, Ms. Horchow's application and Ms. Routman's application?

A.   Yes.

Q.   This 200,000-dollar check appears to be the balance of a regular membership cost for Ms. Horchow and Ms. Routman, right?

A.   It appears to be, yes.

Q.   Okay.

MR. GAVIN:  Go off the record for a minute.

(Break taken from 9:50 a.m. to 9:55 a.m.)

Q.   (BY MR. GAVIN)  Mr. Hicks, I just have a couple of follow-up questions for you.

A.   Yeah.

Q.   Earlier we talked about whether applicants were identified by name or membership number.

Do you recall when membership numbers were assigned to a member?

09:49:27
09:49:28
09:49:31
09:49:33
09:49:34
09:49:39
09:49:42
09:49:42
09:49:43
09:49:47
09:49:51
09:49:53
09:49:55
09:50:00
09:50:01
09:50:02
09:55:20
09:55:20
09:55:27
09:55:29
09:55:30
09:55:34
09:55:38
09:55:40