IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| REGEN HORCHOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:25-cv-11008-WGY |
| | ) | |
| THE WESTMOOR CLUB, LLC, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### THE WESTMOOR CLUB, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### i. Introduction

Defendant The Westmoor Club, LLC (the "Club") is moving for summary judgment because Plaintiff Regen Horchow lacks standing to bring her claims which, in any event, are either time-barred or fail under Massachusetts law. Given these insurmountable obstacles, all of which are grounded in the undisputed factual record, the Club is entitled to judgment as a matter of law under Fed. R. Civ. P. 56.

Ms. Horchow filed this suit alleging that the Club improperly expelled her as a member in 2024, but it was her ex-husband who was the "primary" member, not her, so she has no standing to complain about his expulsion. Ms. Horchow also claims that the Club was wrong to designate her ex-husband (rather than her) as the primary member, but this designation occurred two decades ago in 2004 – something Ms. Horchow easily could have discovered at the time and which the Club never concealed from her – so this claim is time-barred.

Even if the Court assumes Ms. Horchow has standing to challenge the 2024 expulsion, "'courts do not investigate the question whether [a club] decision was right or wrong, but go no

1

further than to ascertain whether the essential formalities required by the constitution and by-laws of the association have been complied with[.]'" Savill v. Fort Norfolk Yacht Club, Inc., 83 Mass. App. Ct. 1130 (2013) (Rule 1:28 decision) (quoting Richards v. Morison, 229 Mass. 458, 461 (1918)). Ms. Horchow has no evidence that the Club meaningfully failed to comply with its own formalities or that the grounds for the expulsion were substantively unlawful, so this claim, too, is fatally deficient.

Therefore, the Court should enter judgment as a matter of law in the Club's favor for the following reasons: (1) Ms. Horchow was not the primary member of the Club, so she has no standing to challenge the Club's expulsion decision; (2) Ms. Horchow's claim that the Club wrongfully failed to treat her as the primary member is barred by the statute of limitations and cannot be salvaged by any tolling doctrines; (3) Ms. Horchow does not have sufficient evidence to support her claim for judicial review of the Club's expulsion decision, either substantively or procedurally; and (4) Ms. Horchow's Chapter 93A claim fails as a matter of law.

### ii. Concise Statement of Material Facts[1]

*I.      The Membership.*

In 2004, Ms. Horchow and Dr. Fearon applied for membership at the Club, a private, members-only club on Nantucket. See SOF, ¶¶ 1-2, citing SJ Ex. 1 (Application). Ms. Horchow filled out the membership application (the "Application"), but signed the Application on the line designated for the "Spouse Signature." See SOF, ¶¶ 3, 5-6, citing SJ Ex. 1 (Application) at 2 & SJ Ex. 2 (Complaint Ex. 5) at 2. Ms. Horchow had Dr. Fearon sign the Application on the line designated for the "Applicant Signature[.]" See id. Ms. Horchow says she had Dr. Fearon sign on

---

[1] Pursuant to Local Rule 56.1, the material facts in support of the Club's Motion for Summary Judgment are set forth in the accompanying Statement of Undisputed Facts ("SOF"). The Club here summarizes the most salient facts for purposes of this motion.

the "Applicant Signature" line by mistake. See SOF, ¶ 6, citing SJ Ex. 2 (Complaint Ex. 5) at 2.

As a result of Dr. Fearon signing the Application as the "Applicant," the Club admitted him as the primary member of the Club. See SOF, ¶ 8, citing SJ Ex. 4 (John Cowden Deposition Transcript ("Cowden Dep.")) at 31:15-19, SJ Ex. 5 (Graham Goldsmith Deposition Transcript ("G. Goldsmith Dep.")) at 59:17-60:6, & SJ Ex. 6 (Katherine Goldsmith Deposition Transcript ("K. Goldsmith Dep.")) at 40:14-22. Likewise, because Ms. Horchow signed the Application as the "Spouse," the Club admitted her as the spousal member on the Fearon membership. See id. From the inception of the membership, Dr. Fearon was always the primary member of the Club and Ms. Horchow was always the spousal member. See id.; see also SOF ¶¶ 17, citing SJ Ex. 11 (Member Profile), & 22, citing SJ Ex. 10 (Jeffrey Fearon Deposition Transcript ("Fearon Dep.")) at 103:19-21.

The Club assigned Dr. Fearon a membership number, F007, and assigned his family members the same membership number with different letter suffixes to represent their "Family Member" membership status. See SOF, ¶ 10, citing SJ Ex. 8 (Club Bills). Ms. Horchow was assigned the membership number F007A, reflecting her membership type as "Spouse[.]" See id.; see also SOF, ¶ 17, citing SJ Ex. 11 (Member Profile). All billing statements from the Club were addressed to "Dr. & Mrs. Jeffrey Fearon" per Ms. Horchow's instruction written on the Application. See SOF, ¶ 11, citing SJ Ex. 1 (Application) at 2. Chits attached to the Club's bills indicated that Dr. Fearon's purchases were assigned to "Fearon, Jeffrey (F007)", and her purchases were assigned to "Fearon, Regen (F007A)." See SOF, ¶ 12, citing SJ Ex. 8 (Club Bills). Ms. Horchow could also see that she was assigned the F007A membership number and her "Spouse / Secondary" membership designation on the Club's online membership portal and in emails she received from the Club. See SOF, ¶¶ 13 & 17, citing SJ Ex. 9 (Emails Regarding

Club Bills), & SJ Ex. 11 (Member Profile).

## II.     *Ms. Horchow and Dr. Fearon Divorced, but Continued to "Share" the Membership*

Ms. Horchow and Dr. Fearon filed for divorce in 2019 and finalized their divorce in February 2020. See SOF, ¶ 15, citing Docket No. 1 (Complaint) ¶ 28 & SJ Ex. 7 (Horchow Dep.) at 9:14-20. The Membership Plan does not allow divorced members to share a membership. See SOF, ¶¶ 20-21, citing SJ Ex. 14 at 3, 7-8. Ms. Horchow claims that on one occasion between September 2019 and April 2021, someone at the Club told her that she and Dr. Fearon could share the membership while they were divorced because they shared a property on Nantucket and so she believed that she and Dr. Fearon could continue sharing the membership. See SOF, ¶ 18, citing SJ Ex. 12 (Regen Horchow's Responses and Objections to The Westmoor Club's First Set of Interrogatories) at Interrogatory No. 6, & Docket No. 1 (Complaint) ¶ 34.

## III.     *Ms. Horchow and Dr. Fearon Dispute Who Owns The Membership*

On April 6, 2021, Ms. Horchow sent an email to the Club asking that she be listed as the primary member because it was "a little bit of a feminist thing for [her] that the male seems to automatically be listed as the primary in many cases." See SOF, ¶ 24, citing SJ Ex. 15 (Complaint Ex. 3). Ms. Horchow noted that if the membership transfer "causes issues, then don't worry about it" as she did not want to "stir anything up or be difficult." See id. The Club declined Ms. Horchow's request. See SOF, ¶ 24, citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_002-003.

During the 2022 summer season, Ms. Horchow emailed the Club multiple times to ask again that the membership be transferred from Dr. Fearon to Ms. Horchow. See SOF, ¶ 26, 34, & 35 citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0302, & SJ Ex. 2 (Complaint Ex. 5) at 2. Ms. Horchow again stated that she did not want to draw attention to the membership

transfer or have the transfer "trigger any communication to anyone." See id. Specifically, Ms. Horchow did not want Dr. Fearon to find out that the membership was transferred from him to Ms. Horchow because she "was worried that if it were brought to [Dr. Fearon's] attention that any changes were being made, that would lead him to believe that he was the member" which would impact the various negotiations she was having with him at the time. See SOF, ¶¶ 27-28, citing SJ Ex. 7 (Horchow Dep.) at 49:16-50:12, 51:20-52:8. Ms. Horchow intended to use the Club membership as a "bargaining chip" to trade with Dr. Fearon for other assets she wanted to retain after their post-divorce dispute resolved. See SOF, ¶¶ 28-30, citing SJ Ex. 7 (Horchow Dep.) at 45:22-46:6, 49:16-50:12, 51:20-52:8, 58:22-60:21, 77:5-13. Ms. Horchow declined to discuss the ownership of the membership with Dr. Fearon in connection with her request that the Club make the change. See SOF, ¶ 33, citing SJ Ex. 17 (Complaint Ex. 4) at 2.

The Club continued to decline Ms. Horchow's requests and told Ms. Horchow that she and Dr. Fearon would have to resolve their dispute over who would retain the membership on their own because, per the Membership Plan, the Club would "not become involved in disputes regarding any membership in the Club." See SOF, ¶¶ 31 & 35, citing SJ Ex. 2 (Complaint Ex. 5) at 2, SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0380, & SJ Ex. 17 (Complaint Ex. 4) at 2. Although Ms. Horchow and Dr. Fearon's dispute over the membership was grounds for suspension, as an accommodation to Ms. Horchow and Dr. Fearon, the Club agreed to delay suspension of the membership until the 2023 season to give them "sufficient time to reach an agreement on the membership." See SOF, ¶ 35, citing SJ Ex. 17 (Complaint Ex. 4) at 2. Ms. Horchow agreed to work out the membership dispute with Dr. Fearon "without any ramifications to the Club." See id., citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0380.

On February 1, 2023, Ms. Horchow asked the Club to suspend the membership "effective

immediately, until [Dr. Fearon] and I work out our situation." See SOF, ¶ 37, citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0376. The Club understood this to be a joint decision between Ms. Horchow and Dr. Fearon and suspended the membership the following day "pending receipt of an acceptable agreement between you and Mr. Fearon." See SOF, ¶¶ 38 & 41, citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0374 & HORCHOW_0384. Dr. Fearon, however, was not aware that Ms. Horchow suspended the membership. See SOF, ¶ 40, citing SJ Ex. 18 (Fearon Letter to Club). On July 12, 2023, when Dr. Fearon learned of the membership suspension, he wrote a letter to the Club stating that he was "the holder of the Club membership" and demanded that the membership be reinstated. See id. The Club forwarded Dr. Fearon's letter to Ms. Horchow and stated that the "Club does not become involved in marital disputes. It was our understanding that the decision to suspend your membership was a joint decision while you and your attorneys sorted things out…Please work this through with your attorneys." See SOF, ¶ 41, citing SJ Ex. 16 (Horchow and Club Emails) at HORCHOW_0374. The Club then unsuspended the membership. See id.

IV.     The Texas Lawsuit and Expulsion

On August 29, 2023, Ms. Horchow sued the Club in Dallas County, Texas for breach of contract, conspiracy to defraud, and seeking declaratory judgment that she was the owner of the membership. See SOF, ¶ 44, citing SJ Ex. 21 (Horchow Texas Petition) ¶¶ 43-53. Her factual assertions in that suit are similar to those she is advancing in this Court. See, generally, Docket No. 1 (Complaint).

On October 10, 2024, the Club sent a letter to both Ms. Horchow and Dr. Fearon notifying them of the Club's decision to expel them due to the "un-club-like" behavior they engaged in by involving the Club in their membership dispute in violation of the Membership

Plan. See SOF, ¶ 45, citing SJ Ex. 22 (Expulsion Letter). In the same letter, the Club stated "[y]ou have the right to appeal this decision to the Club within 15 days." Id. Ms. Horchow and Dr. Fearon separately appealed the Club's decision to expel them and, on January 29, 2025, after separate hearings before the Club's Appeal Committee, the Appeal Committee affirmed the Club's decision to expel both Dr. Fearon and Ms. Horchow. See SOF, ¶ 46, citing Docket No. 1 (Complaint) ¶ 62, & SJ Ex. 23 (Club Appeal Committee Letters).

### iii. Argument

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Sebright v. Gen. Elec. Co., 525 F. Supp. 3d 217, 231–32 (D. Mass. 2021) (Young, J.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule

56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Id. (citation omitted).

Here, the undisputed facts confirm that Ms. Horchow has no standing to complain about her ex-husband's expulsion from the Club. Ms. Horchow's alternative claim that the Club was wrong to treat her ex-husband as the primary member in the first place is a claim that accrued back in 2004 and Ms. Horchow can offer no facts to support tolling the statute of limitations. Even were the Court to assume Ms. Horchow has standing to challenge the expulsion decision, that claim is little more than a request to have this Court review an internal club decision, which is not a viable claim under Massachusetts law. Since Ms. Horchow also cannot state a claim for violation of Chapter 93A, the Court should enter judgment as a matter of law in favor of the Club on all counts of the Complaint.

## I.    MS. HORCHOW WAS NOT THE PRIMARY MEMBER OF THE CLUB, SO SHE HAS NO STANDING TO CHALLENGE THE CLUB'S EXPULSION DECISION

The Club designated Dr. Fearon as the primary member and Ms. Horchow claims the Club was wrong to do so. See SOF, ¶ 8, citing SJ Ex. 4 (Cowden Dep.) at 31:15-19, SJ Ex. 5 (G. Goldsmith Dep.) at 59:17-60:6, & SJ Ex. 6 (K. Goldsmith Dep.) at 40:14-22. Thus, the parties agree that Dr. Fearon was the designated primary member of the Club at the time of the expulsion. See SOF, ¶ 26, citing SJ Ex. 16 (Horchow and Club Emails). The Club's Membership Plan is clear that memberships are owned individually. See SOF, ¶ 20, citing SJ Ex. 14 (Membership Plan) at 3. Upon her divorce from Dr. Fearon in 2020, she had no standing as an ex-spouse to complain about an expulsion of her ex-husband several years later in 2024.

When standing is at issue, "the suing party at the summary judgment stage must point to specific evidence in the record, not simply rely on 'mere allegations[,]" to establish the requisite standing. Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 21 (1st Cir. 2016). Moreover, "a

defendant is not required to present affirmative evidence that refutes a plaintiff's basis for standing." Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 35, 849 N.E.2d 197, 209–10 (2006). "It is enough that the moving party 'demonstrate[ ], by reference to material described in Mass. R. Civ. P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving' a legally cognizable injury." Id.

Here, while Ms. Horchow alleges that the Club was wrong to treat Dr. Fearon as the primary member back in 2004, there is no dispute that she was not the primary member when the Club expelled her ex-husband in 2024. Accordingly, she suffered no injury in fact from the Club's expulsion decision and has no standing to sue on that claim. Therefore, the Court should enter summary judgment in favor of the Club on Ms. Horchow's claims challenging the expulsion decision.

## II. MS. HORCHOW'S CLAIM THAT THE CLUB WRONGFULLY FAILED TO TREAT HER AS THE PRIMARY MEMBER IS BARRED BY THE STATUTE OF LIMITATIONS AND CANNOT BE SALVAGED BY ANY TOLLING DOCTRINES

In addition to complaining about the expulsion, Ms. Horchow also claims that the Club was wrong to designate her ex-husband as the primary member given that she filled out the Club's membership application and her father paid the membership deposit. See Docket No. 1 (Complaint) ¶¶ 14, 16, 22. The Club's designation of Dr. Fearon as the primary member, however, occurred in 2004. See SOF, ¶ 8, citing SJ Ex. 4 (Cowden Dep.) at 31:15-19, SJ Ex. 5 (G. Goldsmith Dep.) at 59:17-60:6, & SJ Ex. 6 (K. Goldsmith Dep.) at 40:14-22. Since Ms. Horchow did not file this suit until 21 years later in 2025, her claims are barred by all applicable statutes of limitations unless she can adduce facts sufficient to invoke equitable tolling doctrines. She can present no such facts, so her claims are all time-barred.

This Court may decide whether the statute of limitations bars Plaintiff's claims as a

9

matter of law. See, e.g., RTR Techs., Inc. v. Helming, 707 F.3d 84, 91 (1st Cir. 2013) (stating that summary judgment is appropriate on statute of limitations grounds where plaintiff cannot "demonstrate a reasonable expectation of proving that her suit was timely filed") (quoting, parenthetically, Doe v. Creighton, 439 Mass. 281, 786 N.E.2d 1211, 1214 (2003)). "Although determining whether the discovery rule, fraudulent concealment, or equitable tolling should apply in a case is a question of fact to be determined by the finder of fact, the court can grant a [dispositive motion] if no set of facts would entitle the plaintiff to relief." Abdallah v. Bain Cap. LLC, 880 F. Supp. 2d 190, 198 (D. Mass. 2012); see also Massachusetts Hous. Opportunities Corp. v. Whitman & Bingham Assocs., P.C., 83 Mass. App. Ct. 325, 328, 983 N.E.2d 734, 737 (2013) (holding that "when the facts regarding discovery of harm are undisputed, the question may be decided as matter of law.'") (citation omitted).

The rule governing equitable tolling of a statute of limitations because of fraudulent concealment is set forth under Massachusetts law at M.G.L. c. 260 § 12. "The Supreme Judicial Court of Massachusetts has held that, in the absence of a fiduciary relationship, the statute of limitations may be tolled because of fraudulent concealment only 'if the wrongdoer . . . concealed the existence of a cause of action through some affirmative act done with intent to deceive.'" Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts., 87 F.4th 62, 76 (1st Cir. 2023) (citations ).

In order to toll the running of a statute of limitations on grounds of fraudulent concealment, see M.G.L. c. 260, § 12, a plaintiff must offer specific evidence "regarding the time, place, and manner of any fraudulent concealment." Abdallah v. Bain Cap. LLC, 880 F. Supp. 2d 190, 198 (D. Mass. 2012). Put another way, tolling based upon fraudulent concealment is inapplicable "without specific evidence of active fraud by [the defendant] intended to conceal

the cause of action from [the Plaintiff]." As the First Circuit has held, "mere silence is not fraudulent concealment." Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts., 605 F. Supp. 3d 273, 295 (D. Mass. 2022), aff'd, 87 F.4th 62 (1st Cir. 2023) (quoting Stetson v. French, 321 Mass. 195, 72 N.E.2d 410, 412 (1947)). "To toll the statute of limitations, 'there must be something in the nature of positive acts with intent to deceive.'" Id. Summary judgment is appropriate against a party pleading fraudulent concealment where that party fails to offer "any factual basis from which a reasonable factfinder could conclude that [the defendant] intentionally concealed any cause of action" from the party. Id.

As this Court has emphasized, the doctrine of "equitable tolling," "should only be applied when the plaintiff could not have discovered, with reasonable diligence, information that was essential to the cause of action within the statute of limitations." Abdallah, 880 F. Supp. 2d at 198. Thus, a party alleging that it did not discover its cause of action until a later date must offer specific evidence that the information it discovered "*could not* have been found by a timely diligent inquiry" at an earlier date. Id.

Here, Ms. Horchow is unable to offer any evidence that the Club fraudulently concealed its designation of Dr. Fearon as the primary member from her. Indeed, Ms. Horchow's Complaint does not even press such an allegation. Ms. Horchow could have inquired as to her membership status at any time, and this information was also readily accessible on the Club's website and reflected on the invoices she received and paid monthly (which included chits indicating that Dr. Fearon had the primary membership number of F007 and she held the secondary membership number of F007A). See SOF ¶¶ 10, 12, 13, 16, 17, citing SJ Ex. 4 (Cowden Dep.) at 13:10-15, 15:17-16:14, SJ Ex. 7 (Horchow Dep.) at 22:9-23:5, SJ Ex. 8 (Club Bills), SJ Ex. 9 (Emails

Regarding Club Bills), & SJ Ex. 11 (Member Profile).The fact that Dr. Fearon was the primary member was not concealed from her in any sense.

So, too, Ms. Horchow cannot offer evidence that the information she did discover upon casually perusing the Club's website in 2021 could not have been discovered earlier. On the contrary, as she was in regular contact with the Club, she could have discovered her membership status at any time from 2004 to the date she filed suit.

To the degree that Ms. Horchow claims the Club, at some point, transferred the membership from her to her ex-husband, Ms. Horchow has no evidence that such a thing ever occurred. Thus, any claim that Ms. Horchow may have had against the Club for improperly designating Dr. Fearon as the primary member accrued back in 2004 when the Club admitted him as a member and her as the spouse. Therefore, such a claim is barred by the applicable statute of limitations, and Ms. Horchow has no evidence to support tolling the statute, so this Court should enter judgment as a matter of law in favor the Club.

### III. MS. HORCHOW DOES NOT HAVE SUFFICIENT EVIDENCE TO SUPPORT HER CLAIM FOR JUDICIAL REVIEW OF THE CLUB'S EXPULSION DECISION, EITHER SUBSTANTIVELY OR PROCEDURALLY

As is well-settled in Massachusetts, "judicial review of membership decisions made by private clubs is limited." Savill v. Fort Norfolk Yacht Club, Inc., 83 Mass. App. Ct. 1130 (2013) (Rule 1:28 decision). "'The courts do not investigate the question whether the decision was right or wrong, but go no further than to ascertain whether the essential formalities required by the constitution and by-laws of the association have been complied with[.]'" Id. (quoting Richards v. Morison, 229 Mass. 458, 461 (1918)). In other words, courts review whether the club followed its own procedures, but do not review the substance of the decision. See, e.g., Casey v. Allen Harbor Yacht Club, Inc., No. 05-00417, 2007 WL 5578210, at *3 (Mass. Super. Oct. 11, 2007)

12

(citing, *inter alia*, Eustace v. Dickey, 240 Mass. 55, 83 (1921), a copy of which is attached hereto at Addendum. The Court "must not serve as a board of general appeal to review the rationale of the club's conduct as it relates to the expulsion of members." Id. (quoting Richards, 229 Mass. at 461) (citing Snay v. Lovely, 276 Mass. 159, 163-64 (1931) ("Courts do not sit in review of decisions thus made by such officers, even though it may appear that there has been an honest error in judgment, an innocent mistake in drawing inferences or making observations, or a failure to secure all information available by a more acute and searching investigation"); Eustace, 240 Mass. at 83 ("The judgment of the court cannot be substituted for the discretion of the constituted authorities, when fairly exercised")).

By becoming a member of the Club, Ms. Horchow agreed to be bound by its rules and subject to its discipline. See Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 336 (D. Mass. 2012), aff'd, 527 F. App'x 20 (1st Cir. 2013); see also Casey, 2007 WL 5578210, at *3 (citing Richards, 229 Mass. at 460 ("By joining a private organization, the plaintiff agreed to the organization's disciplinary rules and thereby accepted liability for expulsion, when ordered in accordance with the organization's rules")); see also Snay, 276 Mass. at 163–64 ("As an incident of membership [plaintiff] consented to be suspended or expelled in accordance with the constitution and rules of the union by its appropriate officers acting in good faith and in conformity to natural justice."). The Membership Plan specifies:

> Any Member whose conduct shall be deemed by the Club, in its sole judgment, to be improper or likely to endanger the safety, harmony or good reputation of the Club or of its members, may be … expelled from the Club….The Club reserves the right to discipline a Member, and a Member's Family Members, or guest, in accordance herewith, for any other cause deemed sufficient by the Club….

SJ Ex. 14 (Membership Plan) at 10.

Ms. Horchow and Dr. Fearon filed for divorce in 2019. See SOF, ¶ 15, citing Docket No.

13

1 (Complaint) ¶ 28. During the divorce proceedings, they never resolved how the Club membership should be treated, so a dispute eventually arose between them over who owned the membership. See SOF, ¶¶ 19, 25, 40, citing SJ Ex. 9 (Emails Regarding Club Bills) at HORCHOW_0304, SJ Ex. 13 (Horchow Email to Fearon), SJ Ex. 18 (Fearon Letter to Club). Rather than resolving the membership dispute without Club involvement, Ms. Horchow sued the Club, forcing the Club to involve itself in their membership dispute. See SOF, ¶ 44, citing SJ Ex. 21 (Horchow Texas Petition). The Club expelled Ms. Horchow and Dr. Fearon for violating the Club's Membership Plan by failing to timely inform the Club of their divorce and then embroiling the Club in their post-divorce litigation over which of them was the primary member.[2] See SOF, ¶¶ 45-46, citing Docket No. 1 (Complaint) ¶ 62, SJ Ex. 22 (Expulsion Letter), & SJ Ex. 23 (Club Appeal Committee Letters). The Club decided, and its Club's Appeals Committee affirmed, that Ms. Horchow's highly adversarial and wrongful conduct to be "so improper as to justify [her] expulsion from the Club." See id. This determination was made in the Club's sole judgment, as allowed by the Membership Plan and Massachusetts law. See SJ Ex. 14 (Membership Plan) at 10. Therefore, Ms. Horchow has no basis to challenge this internal decision as a matter of law. See Savill v. Fort Norfolk Yacht Club, Inc., 83 Mass. App. Ct. 1130 (2013).

Ms. Horchow also has no good grounds to claim that the Club failed to comply with the key provisions of the Membership Plan when it expelled her. Therefore, her effort to challenge the Club's expulsion decision on this basis cannot succeed.

As the Supreme Judicial Court stated more than a century ago:

[Courts]…go no further than to ascertain whether the *essential formalities* required by the constitution and by-laws of the association have been complied with,

---

[2] After their respective expulsions, Ms. Horchow and Dr. Fearon settled their divorce dispute. See Docket No. 1 (Complaint) ¶ 57. The settlement does not address ownership of the Club membership. See id.

whether the proceedings have been regular, whether the cause assigned is one sufficient in law to warrant expulsion, whether the member has been given a fair chance to present his side of the controversy so as to satisfy the requirements of natural justice, whether the decision is within the scope of the jurisdiction and whether it has been reached in good faith, and whether the action appears to have been within an exercise of sound reason or to have been capricious, arbitrary and irrational.

Richards v. Morison, 229 Mass. 458, 461 (1918) (emphasis added). The Membership Plan provides the following formalities to be taken in the event of disciplinary action against a Club member:

Any Member against whom disciplinary action is being considered will be notified either verbally or in writing of any proposed action and will be given an opportunity to be heard by the Club to show cause why he or she should not be disciplined. If the Member desires to be heard, the member must provide a written request for a hearing to the Club within fifteen (15) days of the date of the Club's notice to the Member of the proposed action. Upon the Club's receipt of the written request for a hearing, the Club will set a time and date not less than ten (10) days thereafter for such hearing.…There is no requirement that a Member receive a warning prior to disciplinary action. Family Member and guest privileges may be terminated without prior notice or a hearing.

SJ Ex. 14 (Membership Plan) at 11.

Foremost, Ms. Horchow was the spouse of the Club's member, Dr. Fearon, and therefore prior notice of the Club's decision to expel her was not required, nor was a hearing. See id., at 4 ("the spouse of a married member" is a "Family Member"). Nevertheless, the Club allowed Ms. Horchow the opportunity to appeal the Club's decision to provide her with a fair chance to present her side of the controversy. See SOF, ¶ 46, citing Docket No. 1 (Complaint) ¶ 62, & SJ Ex. 23 (Club Appeal Committee Letters). Ms. Horchow received a hearing before the Club's Appeal Committee, attended with her counsel, presented her side of the story, and answered questions from the Appeal Committee about the dispute. See id. After the hearing, the Committee decided to affirm the Club's decision to expel her. See id.

15

Even if Ms. Horchow were considered the Club's member and Dr. Fearon the member spouse, the Club followed all essential formalities required by the Membership Plan. The Club notified Ms. Horchow in writing of its decision to expel her on October 10, 2024. See SJ Ex. 22 (Expulsion Letter). Within the letter, the Club stated that Ms. Horchow had the right to appeal the Club's expulsion decision within 15 days. See id. Ms. Horchow thereafter appealed the decision and attended a hearing before the Club's Appeal Committee that chose to affirm the Club's decision for the following sound reasons: (i) failure to promptly inform the Club of her divorce to allow Ms. Horchow and Dr. Fearon to continue to use the Club as if they were still married; (ii) involving the Club in her membership dispute with Dr. Fearon; and (iii) suing the Club in a foreign jurisdiction in relation to her divorce with Dr. Fearon. There is no evidence in the record that this decision was not made in good faith or in line with the Club's Membership Plan. Indeed, the Club's Membership Plan is clear in that "[a]ny Member whose conduct shall be deemed by the Club, in its sole judgment, to be improper or likely to endanger the safety, harmony or good reputation of the Club or of its members, may be…expelled from the Club." SJ Ex. 14 (Membership Plan) at 10. Accordingly, there is no evidence of any abuse of process here as the Club followed all essential formalities when it expelled Ms. Horchow.

Ms. Horchow claims that "as a direct and proximate result of The Club's breach, Ms. Horchow has been deprived of the benefit of her membership." Docket No. 1 (Complaint) ¶ 73. The Club, however, properly expelled Ms. Horchow. Once Ms. Horchow was expelled, she was no longer entitled to any benefits from the membership. The Membership Plan specifies that "[u]pon the expulsion of a Member, the Member will forfeit the membership and will not be entitled to any refund of his or her Membership Deposit unless the Club determines, in its sole discretion, that refund of some portion of the Membership Deposit is appropriate." SJ Ex. 14

(Membership Plan) at 11. Ms. Horchow agreed to be bound by the terms of the Membership Plan, and, per the Membership Plan, upon her expulsion, she forfeited the Membership Deposit and any benefits derived from membership at the Club. See id. The Club followed the essential formalities required under the Membership Plan and expelled Ms. Horchow because it believed in good faith and in its sole judgment that her conduct was so improper as to justify her expulsion. Simply put, because the Club properly expelled her, Ms. Horchow is not entitled to any amount from the Club.

In Count II of the Complaint, Plaintiff alleges that the Club breached the covenant of good faith and fair dealing implied within the Membership Plan "by preventing Ms. Horchow from enjoying the benefits to which she was entitled under the parties' contract for its own benefit, and by attempting to circumvent the refund provisions of the Membership Plan." Docket No. 1 (Complaint) ¶ 77. Ms. Horchow testified, however, that she did not experience any impact from being listed as the spouse member. See SOF, ¶ 23, citing SJ Ex. 7 (Horchow Dep.) at 50:13-51:19. According to Ms. Horchow's own admission, the Club did not breach the covenant of good faith and fair dealing during her membership because the Club did not prevent her from enjoying the benefits of the membership.

The Club allowed Ms. Horchow and Dr. Fearon ample time to try to resolve the membership dispute. When they could not, the Club expelled them. Ms. Horchow cannot identify any evidence or factual disputes supporting a viable claim to challenge the Club's actions on either substantive or procedural grounds. Therefore, the Court should dismiss the Complaint for this reason as well.

## IV.    MS. HORCHOW'S CHAPTER 93A CLAIM FAILS AS A MATTER OF LAW.

17

As is well-settled, Massachusetts' Chapter 93A "is not applicable to an intra-enterprise relationship between a club and its members." Soltys v. Wellesley Country Club, 2002 WL 31998398, at *10 (Mass. Super. Oct. 28, 2002), a copy of which is attached hereto at Addendum. "Transactions that are 'principally private in nature . . . do not fall within the purview of G.L. c. 93A.'" Id., at *10 (quoting Office One, Inc. v. Lopez, 437 Mass. 113, 125 (2002)); see also Zimmerman v. Bogoff, 402 Mass. 650, 662 (1988) (holding c. 93A inapplicable to private grievance between shareholders); Riseman v. Orion Research, Inc., 394 Mass. 311, 313–314, (1985) (c. 93A not intended to redress wrongs asserted by stockholder against a corporation in the internal governance of the corporation); Manning v. Zuckerman, 388 Mass. 8, 14 (1983) (c. 93A not intended to apply to contract dispute between employee and employer which was principally "private in nature"); Newton v. Moffie, 13 Mass. App. Ct. 462, 467 (1982) (c. 93A "was intended to apply only to dealings between legally separate 'persons' engaged in arm's length transactions").

Ms. Horchow's Chapter 93A claim arises exclusively from the private relationship between the Club and its former member, Ms. Horchow. See SJ Ex. 7 (Horchow Dep.) at 54:1-20 ("My [membership] issue is with the club…My [membership] issue was with the club from the very beginning"). By the terms of the Membership Plan, it is clear that any actions taken by the Club necessarily occurred in the context of the Parties' private relationship, and not in an arms-length commercial transaction between a business and consumer. See Manning v. Zuckerman, 388 Mass. 8, 11 (1983). The Club was not engaged in any trade or commerce, thus Ms. Horchow's Chapter 93A claim fails as a matter of law.

Ms. Horchow asserts that the Club violated Chapter 93A by: (a) failing to abide by the terms of the Membership Application designating Ms. Horchow as the "Member," and instead

18

recognizing Mr. Fearon's claim to the membership; (b) inconsistently applying the Membership Plan to refuse to confirm Ms. Horchow's status as the "Member," while explicitly recognizing Mr. Fearon's contrary claim; (c) misapplying the terms of the Membership Plan to expel Plaintiff and withhold the Membership Deposit refund otherwise due to Ms. Horchow based on Ms. Horchow's attempts to protect her legal rights and interests; and (d) expelling Plaintiff from the membership when she sought to protect her legal rights. See Docket No. 1 (Complaint) ¶¶ 80-81. Each and every one of these allegations arises out of her unsuccessful breach of contract claim, so her Chapter 93A claim must fail as well.

The Club's recognition of Dr. Fearon as the primary member and Ms. Horchow as the spousal member based on their signatures on the Membership Application does not constitute an unfair or deceptive business practice. "Not just any breach of contract is sufficient to constitute an unfair or deceptive trade practice under Chapter 93A; a simple intentional or negligent breach does not qualify." Wagner v. Fed. Home Loan Mortg. Corp., 494 F. Supp. 3d 80, 87 (D. Mass. 2020) (internal citation omitted). "In order to transform a breach of contract into a Chapter 93A claim, the breach must be both knowing and intended to secure unbargained-for benefits to the detriment of the other party." Id. (internal citations and quotations omitted). There is no evidence that the Club received any benefit from designating Dr. Fearon as the primary member.

Similarly, Ms. Horchow fails to allege any facts to show a requisite "pernicious purpose, an ulterior motive, or a coercive or extortionate objective,"[3] for the Club to have allegedly "inconsistently appl[ied] the Membership Plan" to deny her claim to the primary membership and instead recognized Dr. Fearon's claim. The Club treated both Ms. Horchow and Dr. Fearon the same when it expelled both of them for failing to timely notify the Club of their divorce and

---

[3] Cyran v. Sovereign Bank, 2008 WL 2510146, at *5 (D. Mass. June 10, 2008) (internal citation and quotations omitted), a copy of which is attached hereto at Addendum.

dragging the Club into their membership dispute. Following Ms. Horchow's allegations that the Club inconsistently applied the Membership Plan to deny her claim to the primary membership and instead recognize Dr. Fearon's, only to then expel both of them and selling the membership for a profit, such an act does not "rise to the level of rascality required for Chapter 93A liability." Ahern v. Scholz, 85 F.3d 774, 800 (1st Cir. 1996) (finding that although the defendant knowingly breached the contract in order to gain a benefit—plaintiff's share of the royalties from record albums—was not sufficient to rise to the level of a violation of Chapter 93A). Therefore, the Court should dismiss Ms. Horchow's claim as a matter of law.

### iv. Conclusion

For the foregoing reasons, the Club respectfully requests that this Court allow its Motion for Summary Judgment on all of Plaintiff's claims against it.

Respectfully submitted,

**THE WESTMOOR CLUB, LLC**

By its attorneys,

*/s/ Meghan E. Huggan*
Tyler E. Chapman (BBO # 637852)
Meghan E. Huggan (BBO # 708122)
TODD & WELD LLP
One Federal Street, 27" Floor
Boston, MA 02110
(617) 720-2626
tchapman@toddweld.com
Dated: April 10, 2026          mhuggan@toddweld.com

### CERTIFICATE OF SERVICE

I, Meghan E. Huggan, hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 10, 2026.

*/s/ Meghan E. Huggan*
Meghan E. Huggan

# <u>ADDENDUM</u>

24 Mass.L.Rptr. 564

24 Mass.L.Rptr. 564
Superior Court of Massachusetts,
Barnstable County.

James F. CASEY et al.[1]

v.

ALLEN HARBOR YACHT CLUB, INC.

No. 05-00417.
|
Oct. 11, 2007.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

GARY A. NICKERSON, Justice.

**\*1** This action arose after the plaintiffs, James F. and Doris T. Casey, were expelled from Allen Harbor Yacht Club ("AHYC"), a private organization. They seek a declaratory judgment to reinstate their membership. The defendant, AHYC filed a motion for summary judgment.

BACKGROUND

The court views the facts in the light most favorable to the Caseys, the non-moving party. The Caseys were long-term members of the AHYC, and had agreed to be bound to the club's bylaws and code of conduct. The AHYC Board voted to expel the Caseys in August 2005. Although the incident that gave rise to the expulsion occurred in July 2005, the relationship between the Board and the Caseys started to disintegrate in November 2003.

The Caseys, and other members, first expressed concern about the finances and current club leadership in a letter dated November 28, 2003. The letter instigated a series of communications and meetings between the Caseys and the Board during the following four months. In March 2004, the Board suspended, but then conditionally reinstated, the Caseys' status as AHYC members. The Board sent a letter to the Caseys following its suspension-reinstatement decision. The letter memorialized the Board's belief that the Caseys' conduct during this dispute harmed AHYC and it forewarned the Caseys that any future transgression of the Club rules

would result in their expulsion from the Club. The Caseys assert that they were not treated fairly during this period of disagreement.

The incident that brought about the expulsion at issue occurred on July 12, 2005. Three individuals, one of whom served on the Board, contend that the Caseys pushed some of them on a dock at the club. The alleged victims of this battery sent written complaints to the then-Commodore William Cullinane. The Caseys deny the alleged battery. As a result of the allegations, Cullinane called for a special session of the Board to meet on July 23, 2005. The Caseys were not interviewed before the July 23 meeting. After the July 23 meeting, the Board decided to conduct a further investigation into the July 12 incident. The Board scheduled a follow-up hearing for July 30 to decide how to respond to the incident.

Cullinane sent a letter to the Caseys on July 23, 2005. In this letter, Cullinane notified the Caseys of the upcoming July 30 meeting. The Caseys point to Cullinane's letter as evidence that the procedures afforded to them were unfair. They contend that they were presumed guilty before they had a chance to present their side of the evidence to the Board. Cullinane's letter expressed his opinion that the incident, "as described" violated the code of conduct. The letter states that the Board's decision will hinge on the facts it assembles, including any statement the Caseys wish to make on or before the July 30 meeting. James Casey attended the July 30 meeting with his son and presented his version of the facts to the Board.

The Board never took a statement from Doris Casey nor did she volunteer any statement to the Board. The Caseys' attorney only received relevant materials from the July 23 meeting a day or two prior to the July 30 meeting. Their attorney was not present at the July 30 meeting. The Caseys assert that they did not have adequate representation from counsel during this proceeding. The Board found that the Caseys violated the Code of Conduct and it voted to revoke their membership. The statements in hand from the interested parties provided the sole evidence upon which the Board reached its conclusion.

**\*2** AHYC expelled the Caseys based upon the bylaws in effect during 2005. AHYC's bylaws were properly amended by the club's legal committee and approved by two-thirds of the club's membership at the annual meeting, held in August 2004. The 2004 hearing, suspension, and membership reinstatement were based upon a less detailed set of bylaws

24 Mass.L.Rptr. 564

in effect before the bylaws were amended in August of that year. The Caseys argue that the August 2004 amendments to the disciplinary portion of the bylaws were motivated by their previous challenge to the Board.

The AHYC bylaws, as amended, provide in relevant part: "The Board of Directors, by a vote of two-thirds of its members present at a duly constituted meeting, may suspend or expel any member found guilty of conduct inconsistent with the welfare, interest and character of the club, provided that such notice of the charge be mailed to the member concerned at such member's last known address at least seven days prior to the meeting at which such action is to be taken and such mailing shall constitute notice under this provision. At such meeting such member may be heard and may respond to such charges if so desired." (Allen Harbor Yacht Club, Inc. Bylaws, Art. X.) The bylaws define the word "member" to include a husband and wife, so that AHYC considers James and Doris Casey as one member. (Allen Harbor Yacht Club, Inc. Bylaws, Art. III, § 1.)

The Caseys presented evidence to the court that the Board handled at least one factually similar incident, an alleged battery between members, differently than it handled the allegations leveled against the Caseys. The parties disagree as to whether this incident is factually similar to the Caseys' incident and they disagree about whether the proper procedures were followed to handle this other incident. For purposes of this motion, this Court assumes that the Board handled this factually similar incident differently than it handled the incident that lead to the Caseys' expulsion.

The Caseys filed a two-count claim with this Court. First, they seek a declaratory judgment from the Court to reinstate their status as members of AHYC. Second, they seek reinstatement based on an assertion that AHYC violated the terms of their membership agreement.

DISCUSSION

I. Standard for Summary Judgment

A motion for summary judgment should be granted where it appears from the pleadings and evidentiary materials offered that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983). If the moving party

does not bear the burden of proof at trial, it must either submit affirmative evidence negating an essential element of the non-moving party's claim or demonstrate that the non-moving party's evidence is insufficient to establish its claim. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 711 (1991). The party opposing the motion must respond and allege specific facts to establish the existence of a genuine issue of material fact. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989).

**\*3** Since the complaint requested a declaratory judgment, the judge must "declare the rights of the parties" even if the judge grants the motion for summary judgment. *Molly A. v. Commissioner of the Dept of Mental Retardation,* 69 Mass.App.Ct. 267, 288-89 (2007) (citing *146 Dundas Corp. v. Chemical Bank,* 400 Mass. 588, 589 n. 4 (1987)).

II. The Legal Standard Used by the Court to Review the Expulsion of Members from Private Clubs.

Both parties rely on the legal considerations expounded by the Supreme Judicial Court in *Richards v. Morison,* to frame their arguments. 229 Mass. 458, 461 (1918) (upholding member's expulsion because the club followed its own internal procedures established in its bylaws). In *Richards,* the plaintiff challenged his expulsion from a private, social club. Despite the passage of ninety years, this court confronts a factually similar dispute and the considerations from *Richards* apply here. By joining a private organization, the plaintiff agreed to the organization's disciplinary rules and thereby accepted liability for expulsion, when ordered in accordance with the organization's rules. *Id.* at 460.

The court must not serve as a board of general appeal to review the rationale of the club's conduct as it relates to the expulsion of members. The court limits its review to the following general considerations: "[1] whether the essential formalities required by the constitution and bylaws of the association have been complied with, [2] whether the proceedings have been regular, [3] whether the cause assigned is one sufficient in law to warrant expulsion, [4] whether the member has been given a fair chance to present his side of the controversy so as to satisfy the requirements of natural justice, [5] whether the decision is within the scope of the jurisdiction and whether it has been reached in good faith, and [6] whether the action appears to have been within the exercise of sound reason or to have been capricious, arbitrary and irrational." *Id* . at 461. The court does not need

to review these considerations mechanically. *Id.* The first three considerations lend themselves to simple inspection and easily determinable outcomes. The last three interject a degree of value-based considerations, open to potentially different, yet equally reasonable outcomes.

A handful of other Supreme Judicial Court cases, heard in the wake of *Richards,* help this court apply those more pliable standards like fairness, good faith, and natural justice. Those cases have made an important distinction that applies here; namely, the court must apply notions of fairness, good faith, and natural justice to the *procedures* followed by the club, but not the *substance* of its decision. *Snay v. Lovely,* 276 Mass. 159, 163-64 (1931) ( "Courts do not sit in review of decisions thus made by such officers, even though it may appear that there has been an honest error in judgment, an innocent mistake in drawing inferences or making observations, or a failure to secure all information available by a more acute and searching investigation"); *Eustace v. Dickey,* 240 Mass. 55, 83 (1921) ("The discretion of those possessing the power of removal, when applied in good faith, is not subject to re-examination in respect of its wisdom. The judgment of the court cannot be substituted for the discretion of the constituted authorities, when fairly exercised").

 **\*4**  The undertakings of private clubs require substantially less formality than the rights and procedures afforded to parties who appear before the courts of the Commonwealth. The Supreme Judicial Court does not require the club to hold a hearing prior to removing a member. *Eustace,* 240 Mass. at 85. Significantly, in the *Eustace* case, the Supreme Judicial Court found that removal of only one trustee, when there were grounds to remove other trustees, did not support a conclusion that the board acted in an arbitrary or capricious manner. *Id.* at 84-85. Members of clubs do not enjoy an absolute right to counsel. *Richards,* 229 Mass. at 466. The rules of evidence do not apply to internal club proceedings. *Id.* "[A] failure to secure all information available by a more acute and searching investigation" will not render a private club's decision invalid. *Snay,* 276 Mass. at 163-64. A club must hold a hearing and make definitive findings only when the bylaws permit removal only "for cause." *Dittemore v. Dickey,* 249 Mass. 95, 110-12 (1924) (finding that administrative or executive determinations to remove a member need not comply with judicial formalities).

Therefore, the decision of a club's tribunal stands, so long as it acted without bad faith and it reached its decision by following the procedures it describes in its own bylaws. *Donovan v. Travers,* 285 Mass. 167, 174 (1934).

### III. Count I: Declaratory Judgment

The Caseys assert that the bylaws were amended in August 2004 as a result of their initial disagreement with the Board. Since the Caseys do not allege any impropriety with the procedures followed to amend the bylaws, this court finds that the bylaws, as amended by the membership in August 2004, apply to this dispute. The allegation that the bylaws were amended in contemplation of eventually expelling the Caseys-even if this is true-does not overcome their validity, especially since a super-majority of the entire club membership voted in favor of the amendments. The procedures require notice, the opportunity for the accused member to be heard by the board, and a two-thirds vote by the Board to proceed with a sanction.

The Caseys argue that they did not receive notice seven days before the hearing. The bylaws require the board to *mail* notice of the charge seven days in advance of the hearing. The fact that the Caseys did not *receive* the letter seven days in advance of the hearing does not violate the notice requirement of the AHYC bylaws. The Board provided the Caseys with sufficient notice, as required by the AHYC bylaws. James Casey attended the July 30 hearing and he presented his side of the story. The bylaws do not give members the right to counsel in procedures before the Board. The Caseys do not dispute the proper "validation" of the Board's vote.

AHYC satisfied the initial three considerations described in *Richards.* The Board followed the procedures required by its bylaws. Evidence that the Board has treated one member who experienced a similar incident on one occasion differently fails to show sufficient "lack of regularity" or procedural fairness due to all members of AHYC. The Caseys' alleged conduct on July 12 gave the Board sufficient grounds for expulsion. Passing on the wisdom and the substance of the Board's underlying findings falls outside of this Court's purview. *Eustace* recognizes that a Board may treat seemingly similar members in seemingly similar circumstances differently. 240 Mass. at 84-85.

 **\*5**  The Caseys fail to raise any genuine issues of material fact concerning whether AHYC failed to abide by the more pliable considerations described in *Richards.* The Caseys, as a single "member," and represented by James Casey's

participation at the July 30, 2005 meeting, were heard by the Board. The hearing met the minimal requirements supplied by the Supreme Judicial Court. Natural justice takes no offense when one party conducts an investigation based on the bare allegations provided by just one side of a dispute. The Board would have offended notions of natural justice if it prohibited the Caseys from presenting their side of the story before it decided their fate.

The undisputed minutes of the July 30 meeting show that the Board contemplated the alleged violation of the Code of Conduct for two hours before it concluded that a violation occurred. After announcing this finding the Board took another fifty minutes to decide upon an appropriate sanction. The sanction fell within the jurisdiction and power of the Board as provided by the AHYC bylaws and code of conduct. Therefore, the procedures followed by the Board satisfy the remaining considerations described in *Richards.* Moreover, these procedures seem to exceed the minimum requirements since AHYC could expel members even in the absence of just cause. *Dittemore v. Dickey,* 249 Mass. at 110-12.

The Caseys' remaining allegations-lack of proper representation by counsel, inability to question the opposing witnesses, the Board's failure to take Mrs. Casey's statement, improper motives of the Board, inconsistent application of the bylaws to other members, the disputed facts surrounding the July 12 incident-present this Court with legally irrelevant facts. *Snay v. Lovely,* 276 Mass. at 163-64. This Court upholds

the Board's decision to expel the Caseys and finds that AHYC is entitled to a declaratory judgment.

### IV. Count II: Good Faith & Fair Dealing

The fact that the Caseys and AHYC entered into an obligation in the nature of a contract does not modify the decision of this Court. The Caseys received all of the procedures entitled to them by the terms of their membership agreement. The implied covenant of good faith and fair dealing does not give this Court the right to invade the inner workings of private associations. *Snay,* 276 Mass. at 163. The analysis applied to Count I applies equally to Count II. The Court grants the Defendant's Motion for Summary Judgment as to Count II of the Casey's complaint.

### ORDER

It is therefore *ORDERED* that summary judgment enter for the defendant. It is *DECLARED* and *ADJUDICATED* that the Caseys' expulsion from AHYC July 30, 2005 was proper under the AHYC bylaws.

**All Citations**

Not Reported in N.E.2d, 24 Mass.L.Rptr. 564, 2007 WL 5578210

Footnotes

1      Doris T. Casey.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

15 Mass.L.Rptr. 650
Superior Court of Massachusetts.

Thomas SOLTYS et al.,

v.

WELLESLEY COUNTRY CLUB et al.[1]

No. 0000050.
|
Oct. 28, 2002.

MEMORANDUM OF DECISION AND ORDER [On Cross Motions for Partial Summary Judgment]

ELIZABETH BOWEN DONOVAN, Justice.

**\*1** The plaintiffs, Thomas and Mary Soltys ("the Soltys") move for summary judgment on Count VIII-the discrimination claim against defendants, Wellesley Country Club ("WCC"). WCC seeks summary judgment also on Count VIII and on Counts: I-intentional misrepresentation, II-negligent misrepresentation, III-specific performance, IV-detrimental reliance, V-breach of the covenant of good faith and fair dealing and VI-G.L.c. 93A, § 9. The individually named defendants move for summary judgment on Count IX-breach of a fiduciary duty which is the only count pending against them.[2] For the following reasons the plaintiff's motion is denied and the defendants' motions are allowed in part and denied in part.

BACKGROUND

After a hearing, review of the numerous submissions and memoranda, the following facts are undisputed in the summary judgment record. In discussing specific claims reference will be made to other undisputed facts pertinent to the allegation.

The Wellesley Country Club ("WCC") is a non-profit, charitable organization. It was organized on July 6, 1910. A Board of Governors controls and manages the Club's property and affairs pursuant to its By-Laws. The By-Laws grant to the Board the right to issue rules and regulations, regarding but not limited to membership, associated privileges, entrance fees, and dues. A membership application is not available to the public but must be obtained from a Certificate Owning Member. The applicant must be known to and proposed for membership by three Certificate Owning Members. The By-Laws limit the number of Certificate Owning Members to 550.

Thomas Soltys and his wife, Mary Ann Soltys submitted an application in March 1993 seeking golf membership. Full memberships were not available. However, in 1995[3] Thomas Soltys became a Certificate Owning Member of the Club.[4] Mr. Soltys maintained his status until March 2000.

WCC rules required a family to choose between spouses as to who will be the Certificate Owner because the rules did not permit both spouses to be named on the certificate. The Certificate Owner has the option annually of designating his/her spouse as the Certificate Owner. The Certificate Owner holds certain privileges not available to the "spouse golfer." The Soltys have been on the WCC golf wait list (GWL) throughout the duration of their membership.

In 1991 the WCC Women's Golf Association By-Laws were adopted to promote interest in women's golf and to organize and conduct tournaments. Membership was divided into two Ladies Groups, 18 and 9 hole, each having separate Boards, by-laws and committees which are answerable to the WCC golf committee and the Board of Governors. Each member pays annual dues and handicap fees to her respective Group. The Rules and Regulations adopted by the Ladies 18 Hole Group limit tournaments to their members only. An amendment to the Rules and Regulations requires a two-thirds vote of their Executive Board. The WCC has a separate set of By-Laws.

**\*2** From 1995 through 1999, a number of golf tournaments and events were held at the Club. Some of these events were open to women golf members, others to men golf members, while others to golf members regardless of gender. Also, on occasion, tournaments were open only to Certificate Owning Members with golf memberships, regardless of gender. In addition, the Ladies 18 Hole and 9 Hole Groups[5] held their own tournaments and events which, for the most part, were open only to members of the two groups. The tournaments are scheduled at the time requested by the sponsoring Ladies Group.

A GWL Committee was formed in 1999 to address and examine issues pertaining to the GWL. The Soltys attended the committee meetings. The Committee presented

Soltys v. Wellesley Country Club, Not Reported in N.E.2d (2002)

15 Mass.L.Rptr. 650

suggestions to the Board of Governors regarding additional privileges for GWL members. As a result of the suggestions GWL Members[6] could participate in tournaments on a "space available" basis. However this rule did not apply to the Ladies 9 Hole or the 18 Hole Groups because each group, in determining the eligibility requirements for entry into their tournaments, opted to exclude those who were not members of the Ladies group.

On April 9, 1999, Frederick Haynes, the president of WCC, sent a letter to all Club members reporting the changes based on the Committee's recommendations. The president offered full refunds of the initiation fee and bond to GWL members who joined the club from 1994-96 but now wished to resign. The GWL members were offered a new membership which allowed them to either remain on the wait list with the current limited privileges or become "Restricted Golf Members"[7] with more liberal playing privileges. GWL members could continue to play in "certain tournaments on a space-available basis." New advance tee times for GWL members were implemented granting them preference for Monday tee times. Mr. Haynes wrote that GWL members would receive full membership based on when they joined the wait list: in 1994, membership by 2000, in 1995, membership by 2002, and in 1996, membership by 2004 (all subject to review by the Board on an annual basis). After receiving this letter the Soltys chose to remain as GWL Members and not upgrade to the Restricted Golf Membership which cost more money.

Beginning June 1, 1999, the Ladies 18 Hole Group decided to allow women on the GWL who elected the "Restricted Golf Membership" and had the proper handicap (38 or lower)[8] to play in seven of their "regular" Tuesday Tournaments, but the "Major" Tournaments continued to be exclusive. Mrs. Soltys did not qualify because she opted not to become a "Restricted Golf Member."

In June 1999, Mrs. Soltys made several attempts to play in the Ladies 18 Hole Group Tournaments but was denied inclusion. There were a number of tournaments during 1999 which were opened to GWL members including Mrs. Soltys but she did not participate. She was eligible to play in the Ladies 9 Hole Group Tournaments because of a change in their rules but declined to participate.

**\*3** On several occasions, Mr. and Mrs. Soltys voiced their concerns about Mrs. Soltys's exclusion from such tournaments. On October 19, 1999, the Board of Governors informed the Soltys that a hearing would be scheduled regarding the Soltys' continuation as members due to the "alleged aggressive and inflammatory statements made at various meetings." A hearing was held on February 15, 2000 and the Soltys were expelled on March 15, 2000.

DISCUSSION

Summary judgment will be granted where there are no genuine issues of material fact and where the record, including the pleadings and affidavits entitles the moving party to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there are no triable issues. *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989). The nonmoving party cannot defeat a summary judgment motion by resting on the pleadings or merely asserting disputed issues of fact. *Lalonde v. Eissner,* 405 Mass. 207, 209 (1989). However, for the purposes of a summary judgment, the court will review the facts and all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Ford Motor Co., Inc. v. Barrett,* 403 Mass. 240, 242 (1988).

I. Count VIII-Discrimination

A. G.L.c. 151B-Discrimination Claim

The Soltys allege that the WCC discriminated against them in violation of G.L.c. 151B and c. 272 §§ 92A and 98. They claim Mrs. Soltys was excluded from participation in the Ladies 18 Hole Group tournaments even when space was available. She asserts that men similarly situated on the GWL were allowed to play in the mens' tournaments. WCC denies it discriminated against Mrs. Soltys and states the policy of exclusion was set by the members of the Ladies 18-Hole Group.

Before a plaintiff may file a complaint in the Superior Court, she must first file her complaint with the Massachusetts Commission Against Discrimination ("MCAD"). See G.L.c. 151B, § 9; 804 CMR § 1.03(4)(a). "An action cannot be brought in the Superior Court under M.G.L.c. 151B, unless it is preceded by the filing of a complaint of unlawful discrimination with the MCAD within six months of the occurrence of the discriminatory event. See G.L.c. 151B, § 5 ." *Carter v. Commissioner of Correction,* 43 Mass.App.Ct. 212, 217 (1997). However, the six-month limitation will not be applied where the unlawful conduct complained of is of a continuing nature, in which case a complaint is timely filed

even though the discriminatory action commenced more than six months prior to the challenge. *Lynn Teachers Union, Local 1037, AFT, AFL-CIO v. MCAD,* 406 Mass. 515 (1990).

A plaintiff who demonstrates a pattern of discrimination that creates a hostile environment which includes conduct within the six-month statute of limitations may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, unless the plaintiff knew or reasonably should have known that her situation was pervasively hostile and unlikely to improve, and thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct. *Cuddyer v. Stop & Shop,* 434 Mass. 521, 535 (2001). The exception does not pertain to this case nor is it argued by Mrs. Soltys. The denial by the Ladies 18 Hole Group was a discrete event and does not require "a series of related events to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop,* at 531. The Ladies 18 Hole Group rules and regulations were in existence since 1991 and their refusal to allow Mrs. Soltys to participate was the alleged discriminatory act.

 **\*4**  The Soltys filed a complaint with the MCAD on January 11, 2000 alleging that WCC discriminated between men and women on the GWL. They assert that women on the GWL had fewer rights and privileges than men similarly situated including the exclusion of GWL women from playing in the Ladies 18 Hole Group tournaments.[9]

In May 1999 Mrs. Soltys inquired about her eligibility to play in the Ladies 18 Hole Group tournaments on a space-available basis. During May and June she sent several letters to the chair of the Ladies 18 Hole Group requesting to play in the tournaments. On June 17, 1999 Mrs. Soltys sent a $50.00 check seeking membership in the Ladies 18 Hole Group. The check was returned by Kristine Scoon, Chair of the Ladies 18 Hole Group. On June 29th Ms. Scoon wrote to Mrs. Soltys informing her she was not eligible for membership in the Ladies 18 Hole Group until the Soltyses obtained "full golf privileges." Ms. Scoon also wrote that Mrs. Soltys was "not eligible to participate in 18 hole tournament play as tournament play is not open to wait list members at this time ... The women's 18 hole group ... has chosen not to open up its tournament to wait list members at this time and the Golf Committee has accepted this decision on an interim basis."

Mrs. Soltys sent a letter dated July 2, 1999 to Kristine Scoon, addressing her perception of a double standard over the

years whereby men, who are GWL Members and Certificate Owning Members, were allowed to play in tournaments but not their spouse. Mrs. Soltys categorized such conduct as "seems to be at least unequal treatment and discriminatory." On July 8, 1999 Mrs. Soltys sent a memorandum together with correspondence regarding these issues to the GWL members complaining about the Ladies 18 Hole Group's policy and the inequities and inconsistencies of the Club. President Haynes sent a letter to Mrs. Soltys on July 14th stating, "I have reviewed the correspondence between you and the Ladies 18 Hole Group, and at this time concur that you are not eligible to participate in the 18-hole Ladies Championship. As you know, the Board has deferred to the Golf Committee in determining which tournaments are available for wait list play and further, the Golf Committee is in agreement regarding the ladies 18-hole events. I hope this will serve to conclude the matter."

In *Adamczyk v. Augat, Inc.,* 52 Mass.App.Ct. 717, 720 (2001), the Court wrote that the statute of limitation in a discrimination claim begins to run when the facts to support the claim "are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Sturniolo v. Sheaffer, Government Dev. Bank of Puerto Rico,* 27 F.3d 746, 748-49 (1st Cir.1994). The Court went on to say, "the proper focus for determining when a statute of limitations period commences is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Adamczyk v. Augat, Inc.,* 52 Mass.App.Ct. at 721, quoting *School Comm. of Brockton v. Massachusetts Commn. Against Discrimination,* 423 Mass. 7, 11 n. 8 (1996). I will assume for the purpose of the statute of limitations argument that the actions of the Ladies 18 Hole Group were discriminatory.

 **\*5**  The issue is when did the clock begin to run. The defendants argue the letter of June 29th from Ms. Scoon was clear and unequivocal that Mrs. Soltys could neither join the Ladies 18 Hole Group nor play in their tournaments regardless of Mr. Haynes's letter of April 9th. WCC supports this contention with the July 2nd letter from Mrs. Soltys to Ms. Scoon where she complains about the "double standard" wherein Certificate Owning GWL men are allowed to play in tournaments but there is unequal and discriminatory treatment of their spouses. Her statement demonstrates that Mrs. Soltys, as reasonably prudent with regard for her rights, possessed facts she knew or reasonably should have known supported her claim.

On June 1, 1999 the Ladies 18 Hole Group changed their rules to allow women on the GWL who had a handicap of 38 or less and had a Restricted Golf Membership to play. Mrs. Soltys was ineligible because even though she had a handicap of lower than 38 she did not have a "Restricted Golf Membership."

If one assumes Mrs. Soltys was not aware of her predicament by early June, at least by the letters of June 29th and July 2nd the facts were apparent to her that there was a "double standard" and the treatment of women was unequal and discriminatory as compared to their spouses. The letter of Mr. Hayes simply reiterated what was already known to Mrs. Soltys; the Ladies 18 Hole Group tournaments were not open to women on the GWL.

Thus the filing of the complaint with the MCAD on January 11, 2000 occurred more than six months after the alleged discriminatory acts. WCC is entitled as a matter of law to summary judgment on the discrimination claim in Count VIII.

### B. G.L. 151B-Retaliation Claim

Retaliation is a separate and independent cause of action. M.G.L.c 151B, § 4(4), prohibits retaliation by making it unlawful for "any person ... to discharge, expel or otherwise discriminate against a person because he has opposed any practices" forbidden under G.L.c. 151B. See G.L.c. 151B, § 4(4A) (it shall be an unlawful practice for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right" to complain of discrimination that is prohibited by any provision of G.L.c. 151B). To succeed on a claim of retaliation, "the plaintiff must prove that [she] reasonably and in good faith believed that the [club] was engaged in wrongful discrimination, that [she] acted reasonably in response to [her] belief, and that the [club's] desire to retaliate against [her] was the determinative factor in its decision to terminate [her membership]." *Tate v. Department of Mental Health,* 419 Mass. 356, 364 (1995).

In October 1999, WCC notified the Soltys that the club was considering whether their membership was now "detrimental to the best interest of the club." In a letter dated October 19, 1999, Craig D. Mills, counsel for WCC, sent the Soltys a letter addressing the club's consideration of their membership. WCC referred to statements made in various letters sent by Mrs. Soltys as well as statements made by Mr. Soltys at various meetings. WCC contends that the Soltys were expelled due to Mr. Soltys' "volatile and disruptive" behavior at committee meetings. The letter referenced "the purpose,

content and tone of your wife's letters to Board and Club management" as one of the reasons for a meeting to determine the Soltys' status. WCC also included the letters written by Mrs. Soltys regarding her inclusion in the Ladies 18 Hole Group Tournaments as disturbing to the club and its purpose. WCC also claimed that Mr. Soltys's behavior was disruptive. The expulsion hearing was held on February 15, 2000 and the Soltys were expelled on March 15, 2000; after they filed suit with the MCAD. There is no dispute that WCC expelled the Soltys from the club after the filing of their MCAD complaint.[10]

**\*6** As the Court stated in *Abramian v. President & Fellows of Harvard College,* 432 Mass. 107, 121 (2000), G.L.c. 151B, § 4(4) prohibits retaliation by making it unlawful for "any person ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices" forbidden under G.L.c. 151B. See G.L.c. 151B, § 4(4A) (it shall be an unlawful practice for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right" to complain of discrimination that is prohibited by any provision of G.L.c. 151B). The presence of retaliation is largely a factual matter for the jury. *Bain v. City of Springfield,* 424 Mass. 758, 765 (1997).

There is a genuine issue of material fact precluding summary judgment.

### C. G.L.c. 272, § 98-Discrimination Claim

Mrs. Soltys alleges sex discrimination in a place of public accommodation pursuant to G.L.c. 272, § 98.[11] Instituting such a claim under G.L.c. 151B, § 5 is not a bar to proceeding under G.L.c. 272, §§ 92A and 98. Mrs. Soltys is not time barred because of her late filing of the prior claim discussed above with MCAD. See G.L.c. 151B, § 5, Par. 2.

The plaintiff has three elements to establish for a prima facie case: (1) plaintiff is a member of a protected category under the statute,[12] and (2) plaintiff was denied access to or restricted in the use of (3) a place of public accommodation. There is no dispute that Mrs. Soltys is a member of a protected category under the statute. She was denied access to the Ladies 18 Hole Group Tournaments because she was only a GWL member.[13] As stated above, the Ladies 18 Hole Group did not allow GWL members to play in their tournaments unless they were Certificate Owning Members or Restricted Members. Mrs. Soltys was neither. The issue presented in this

claim for discrimination is whether the WCC is a place of public accommodation.

WCC is a nonprofit, charitable organization established in 1910. "In determining whether a facility qualifies as 'a place of public accommodation,' there are several factors considered by courts. The most important factor is the selectivity of membership." See *Haskins v. President & Fellows of Harvard College,* Civil Action No. 993405 (Mass.Super.Ct. Sept. 18, 2001), 13 Mass. L. Rptr. 691 (Zobel, J.). "Absent a genuine selectivity in choosing members, even a private club can fall within the ambit of the Public Accommodations Act." *Id.* See also *Concord Rod & Gun Club, Inc. v. MCAD,* 402 Mass. 716 (1988). However, other factors to consider in resolving this issue are: (1) membership control; (2) history of the organization; (3) use of the facility by non-members; (4) the extent of revenues from non-members; (5) whether the facility advertises to the public; and (6) the formality observed by the club. *U.S. v. Lansdowne Swim Club,* 713 F.Supp. 785, 796-97 (E.D.Pa., 1989); and *Jankey v. Twentieth Century Fox Film,* 14 F.Supp. 1174, 1179 (C.D.Cal., 1998).

**\*7** The membership process at WCC begins first with the submission of an application obtained from an existing Certificate Owning Member. Applicants must be known to or proposed by at least three Certificate Owning Members. Once a prospective member's application is completed and references received, the person is placed on a waiting list for consideration of membership when a vacancy exists. When an applicant reaches the top of the waiting list, the Board of Governors votes whether to admit the applicant into membership. An applicant will be rejected if two out of 15 adverse votes are cast by Board Members. The selectivity in the membership process indicates genuine exclusivity.

The WCC By-laws vest in the Board of Governors control and management of the Club's property, membership, entrance fees and dues. In April 1991 two women's groups were created at WCC to foster golf among women. The women's groups established their own by-laws, rules and regulations for play in their respective groups. The groups operate separately with their own by-laws, officers and committees to manage their activities. The creation of the women's groups predated the GWL. The Board of Governors deferred to the two women's groups to develop their own by-laws, rules and regulations regarding golf for the Ladies 9 and 18 Hole Groups.

In June 1999 both Ladies Groups voted to change their regulations. The Ladies 9 Hole Group allowed women on the GWL to play in their weekly tournaments while the Ladies 18 Hole Group accepted for tournament play women on the "Restricted Golf Membership" list and had a proper handicap. For women who were not members of the either group, WCC sponsored some tournaments open to golf members regardless of gender while others were limited by sex.

The Soltys contend that WCC is a place of public accommodation because it is open to the general public and solicits and accepts the patronage of the general public. WCC budgets income from non-member sources and rents out the golf course for non-member outings. WCC made the golf course available for corporate, charitable, community and golf associated events for a fee. WCC rents out the clubhouse[14] for weddings and functions to non-members but only if the event is sponsored by a member. Non-members are only allowed to use the facilities if invited by a Certificate Owning Member. Although WCC derives revenue from non-member use of its premises, WCC does not advertise to the public the availability of its facilities. See *Wanders v. Bear Hill Golf Club,* Civil No. 971458 (Mass.Super.Ct. Nov. 30, 1998), 1998 WL 1181150 (Zobel, J.). (In *Bear Hill* there was neither a genuine selectivity in choosing members nor was general public access restricted; in fact, it advertised to the general public the availability of its banquet service and hosted charitable, corporate and community events.)

The Soltys argue that WCC derives substantial revenue from corporate, charitable, and community organizations for non-sponsored events. In 1999 WCC's revenue from these groups included only 3.3% of the club's total revenue. The remaining 11.7% were from non-members who were invited as guests by a WCC member. This is not a significant amount of revenue.

**\*8** Thus based on the analysis of the aforementioned factors, it cannot be said as a matter of law that WCC is a "place of public accommodation."[15] WCC's motion for summary judgment on the discrimination claim under M.G.L.c. 272, § 98 is *allowed.*

**II. Intentional and Negligent Misrepresentation (Counts I & II)**

WCC argues that it is entitled to summary judgment on Counts I and II alleging intentional and negligent misrepresentation, respectively. WCC contends that these

claims are time barred by the three-year statute of limitations period.

The Soltys based these claims on a statement allegedly made to them in May 1995, by the Club's Admissions Committee that they would receive "full golf privileges within two to three years." The Soltys claim that the statement was made subsequent to their decision to accept the Club's invitation for membership. WCC claims that a year later Mrs. Soltys knew, on May 1, 1996, that it was going to take more than three years for her to obtain "full golf privileges." WCC argues that in May 1996 Mrs. Soltys believed it would take up to ten years, based on the attrition rate, before they would obtain membership. Thus the Soltys would be required by May 1999 to bring either claim. G.L.c. 260, § 2A.

However, a misrepresentation accrues at the time a "plaintiff learns or reasonably should have learned of the misrepresentation." *Kent v. Dupree,* 13 Mass.App.Ct. 44, 47 (1982). There is a dispute whether the statement was made regarding the waiting period for full golf privileges in two to three years. I shall assume for the purpose of summary judgment the Soltys were told the time period for full membership would occur within two or three years.

When did Mrs. Soltys learn or reasonably should have learned that the wait would be longer than three years? Mrs. Soltys argues she could not actually know of a longer wait period until the three years passed and they still had not received full golf privileges. In that case they could not have known about the misrepresentation until May 1998. Thus this litigation was filed timely.

Whether Mrs. Soltys reasonably knew in 1996 that the wait for full golf privileges was going to be longer than two to three years is a question of fact for the jury. Summary judgment is *denied* on Counts I and II.

### III. Breach of Contract Claim (Count III)

The Soltys allege that WCC breached the contract. They assert that they paid the initiation fee and bond which was consideration for a promise of full golf privileges by May 1998 but WCC breached its obligations by not installing them to full golf membership. Their claim is based on the allegation that the representative of WCC promised they would be full members within two or three years.[16]

WCC argues it is entitled to summary judgment as a matter of law. WCC contends that a contract was not formed based on the alleged statement and any rights that the Soltys have are governed by the By-Laws.

**\*9** Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court. *Allstate Ins. Co. v. Bearce,* 412 Mass. 442, 446-47 (1992); *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 516 (1970). An unambiguous contract must be enforced according to its terms and the subjective contemplations of the parties are immaterial. *Schwanbeck v. Federal-Mogul Corp.,* 412 Mass. 703, 706 (1992), citing *Freelander,* 357 Mass. at 516; *Blakeley v. Pilgrim Packaging Co .,* 4 Mass.App.Ct. 19, 24 (1976). The parties are bound by the plain terms of their contract.

To sustain a claim for breach of contract, plaintiffs must show (1) an agreement; (2) valid consideration; (3) performance or its equivalent by the plaintiffs; (4) breach by the defendant; and (5) damages. There is a dispute as to whether the Soltys were ever told by any member of the Club's Admissions Committee that the GWL would be two to three years. Thus there is a material question of fact in dispute. WCC's motion for summary judgment is *denied* on Count III.

### IV. Detrimental Reliance (Count IV)

The Soltys claim that they relied on the statement of two to three years for full golf privileges to their detriment. WCC asserts that it was unreasonable for the Soltys to rely on such a statement because it was ambiguous on its face.

"To establish a claim of detrimental reliance, a plaintiff must prove all the essential elements of a breach of contract claim with the exception of consideration." *Hansen v. J.L. Hammett Co.,* 53 Mass.App.Ct. 1114 (2002), citing *Rhode Island Hosp. Trust Natl. Bank v. Varadian,* 419 Mass. 841, 850 (1995). In order to survive a motion for summary judgment on a claim of detrimental reliance, the Soltys are required to demonstrate that they reasonably relied upon an unambiguous promise made to them. *Joyce v. McDonald,* 40 Mass.App.Ct. 1116 (2001), citing *Upton v. JWP Businessland,* 425 Mass. 756, 760 (1997). The dispute issue as to whether the Soltys reasonably relied on the alleged statement pertaining to the GWL is a question of fact. WCC's motion for summary judgment on Count IV is *denied.*

V. Breach of Implied Covenant of Good Faith and Fair Dealing (Count V)

WCC argues because no contract was formed between the two parties, there is no breach of implied covenant of good faith and fair dealing.

To support a breach of implied covenant of good faith and fair dealing claim, the plaintiffs must demonstrate the existence of a contract. "Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Commissioner of Ins.,* 406 Mass. 354, 362 m.9 (1990), quoting *Kerrigan v. Boston,* 361 Mass. 24, 33 (1974); see also *Levenson v. LMI Realty Corp.,* 31 Mass.App.Ct. 127, 131 (1991) (holding where parties had not reached a binding contract, the implied covenant of good faith and fair dealing did not apply). The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony Pier Four, Inc. v. NBC Associates,* 411 Mass. 451, 471-72 (1991).

**\*10** This is a question of fact based on the finding of a contract. Summary judgment is *denied* on Count V.

VI. 93A Claim (Count VI)

The Soltys claim a violation of G.L.c. 93A, § 9. WCC argues G.L.c. 93A is not applicable to an intra-enterprise relationship between a club and its members. A violation of G.L.c. 93A, § 2 requires proof of an unfair or deceptive act or practice "in the conduct of any trade or commerce." Trade and commerce are defined in § 1.

The first issue is whether WCC conducts any trade or commerce. The organizational structure is established in the By-Laws with a Board of Governors operating the property as a golf and recreation facility for its members. As such it is analogous to the position of the trustees in *Office One, Inc. v. Lopez,* 437 Mass. 113, 125 (2002). There the trustees were members of a volunteer governing board of the organization of unit owners at River Court. The Court held it was evident from the complaint that the 93A claim arose exclusively from the private relationship between the trustees and the plaintiffs as condominium unit owners. *Id.* at 125. Transactions that are "principally private in nature ... do not fall within the purview of G.L.c. 93A." *Id.* at 125, citing *Zimmerman v. Bogoff,* 402 Mass. 650, 662 (1988). See also *Riseman v. Orion Research Inc.,* 394 Mass. 311, 313-14 (1985). The trustees were not engaged in any trade or commerce.

Similarly, WCC, through its Board of Governors, cannot be said to be engaging in any trade or commerce.

WCC asserts that the Soltys are time barred from bringing a claim pursuant to G.L.c. 93A. This issue need not be addressed in light of the foregoing. WCC's motion for summary judgment on Count VI is *allowed.*

VII. Breach of Fiduciary Duty (Count IX)

The Soltys allege that the individual members of the Board of Governors at WCC owed them a fiduciary duty. They claim the individual members breached the fiduciary duty by refusing to provide full golf membership to them and expelling them from the WCC without the proper proceedings. WCC argues no fiduciary relationship exists between the parties.

A fiduciary relationship may arise from a special relationship or from when one person places particular trust and confidence in another. *Hawkes v. Lackey,* 207 Mass. 424, 432 (1911). To establish a prima facie case for breach of fiduciary duty, plaintiffs must prove that the individual defendants each owed a duty to the plaintiffs, that the duty was breached, and that the plaintiffs suffered damages as a result of the breach. *Beaconsfield Townhouse Condominium Trust v. Zussman,* 49 Mass.App .Ct. 757 (2000); *Hanover Ins. Co. v. Sutton,* 46 Mass.App.Ct. 153, 164 (1999).

As the Court said in *Office One, Inc. v. Lopez,* 437 Mass. at 125: "[T]he plaintiffs cannot succeed on this claim, however, because, as matter of law, members of a governing board of a condominium association, in the capacity of the trustees here, owe no fiduciary duty to individual condominium unit owners." The Soltys cannot prove a special relationship between the Board of Governors and themselves. Here, the individual defendants owed a fiduciary duty to the Club, not to Mr. & Mrs. Soltys. Therefore, the individual defendants' motion for summary judgment is *allowed.*

ORDER

**\*11** The Wellesley Country Club's motion for summary judgment is *allowed* on Count VIII, the discrimination claims pursuant to c. 151B and c. 272 § 98 and is *denied* on the c. 151B retaliation claim. Its motion is also *denied* on Counts I, II, IV, and V. No action is taken on the request for summary

judgment on Count III-specific performance, as that is left to the trial judge. The individually named defendants' motion for summary judgment is *allowed* on Count IX. Thomas Soltys' and Mary Ann Soltys' motion for summary judgment on Count VIII is *denied.*

**All Citations**

Not Reported in N.E.2d, 15 Mass.L.Rptr. 650, 2002 WL 31998398

Footnotes

1    The defendants include individual members of the Board of Governors of WCC, namely Fred Haynes, Jeff Whitley, Pat Palmer, Davey Scoon, Bob McGinnis, Jim Swenson, Bob McEwen, Ed Joyce, Owen Dugan, Bob Chatel, Jim Keating, Eric Morse, Thomas Skelly, and Denis McCarthy.

2    Count VII alleges a violation of the Massachusetts Civil Rights Statute, G.L.c. 12, § 11I against WCC.

3    The Admissions Chairperson, Owen Dugan, informed GWL members one of their privileges was participation in tournaments where space was available.

4    Owning Members with golf memberships are entitled to "preferred tee times" on Wednesday afternoons, Saturday, Sunday, Holiday mornings and may play at all times when the course is open, except when groups to which they do not belong have preference. A Certificate Owner can be either spouse or both spouses may purchase a Certificate independent of the other. If a spouse applies to become an independent Certificate Owner he/she immediately goes to the top of the membership waiting list. In addition, a Certificate Owner may transfer his/her Certificate Owning Golf Privileges to the other spouse, subject to approval by the Board, without relinquishing his/her other rights under the Certificate.

     The spouse of a Certificate Owner who is eligible for a golf membership may, but is not required to, also obtain a golf membership which is entitled "Spouse Golf." Spouse Golf Members may play only during the "preferred tee times" reserved for Certificate Owning Golf Members, if space is available. Spouse Golf Members may not play when groups to which they do not belong have preference.

5    These groups were created by the women golf members of WCC and are guided by the By-Laws adopted in April 1991, prior to the establishment of the Golf Wait List. These groups operate separately with their own officers and committees which manage their membership and determine how to organize and conduct their events and tournaments.

6    In 1995 and 1996, GWL Members were entitled to play twice per month for payment of a greens fee for each round played. GWL Members were entitled to play most Monday afternoons in July and August without payment of the greens fee. In addition they were entitled to play once a month as a guest of a full golf member. However, during these two years GWL Members were not allowed to bring guests.

     In 1997, GWL Members were allowed to play golf twice a month on available Monday afternoons throughout the season for payment of a greens fee. They were also entitled to bring up to three guests per month on Monday but could not play on Sunday afternoons. Certificate Owning Members on the GWL could utilize their GWL privileges during the "preferred" tee times available only to Certificate Owners on Wednesday afternoons and weekend and Holiday mornings. Spouse GWL Members could not utilize the course during these times unless space was available.

7    The privileges include: the same as current wait list plus these members may bring up to 3 guests per month Monday through Thursday and greens fee apply. Restricted Golf Members were allowed to play 3 additional rounds Tuesday through Thursday, per month starting 6/1/00. Restricted Golf Members were allowed unlimited weekday play after Columbus Day at the discretion of the Pro Shop. It did not affect the GWL male members' ability to play in the tournaments on a space-available basis.

8    Mrs. Soltys, an avid golfer, satisfied the handicap requirement.

9    In May 1995 Mrs. Soltys discussed this issue with Robert MacEwen, the Golf Chair. She expressed her concern of being treated differently than the men on the GWL. Men could play in the tournaments but she could not play in any tournaments sponsored by the Ladies Groups.

10    The statute of limitations is not an issue on the claim for retaliation.

11    M.G.L.c. 272, § 92A defines a "place of public accommodation, resort or amusement" to include "any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public, and includes a place of public amusement, recreation, sport, exercise or entertainment." The statute provides a nonexclusive list of examples, without limiting the generality of the definition.

12    Mr. Soltys is not a member of a protected class. His claim is dismissed.

13    I shall assume for this claim of discrimination that Mrs. Soltys was denied access resulting in sex discrimination.

14    WCC's website features the dining facility for weddings and functions.

15    Even if one could argue that certain factors may tend toward WCC being a place of public accommodation, Mrs. Soltys cannot sustain her burden of sex discrimination by either WCC or the Ladies 18 Hole Group.

16    This contention is disputed by WCC, thereby raising a genuine issue of material fact.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2510146
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Elizabeth V. CYRAN and

Franklin J. Cyran, Plaintiffs,

v.

SOVEREIGN BANK, Defendant.

Civil Action No. 07–40263–FDS.
|
June 10, 2008.

**Attorneys and Law Firms**

David J. Noonan, Attorney at Law, Amherst, MA, for Plaintiff.

J. Patrick Kennedy, Donn A. Randall, Bulkley Richardson & Gelinas LLP, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS*

SAYLOR, District Judge.

**\*1** This is an action for breach of contract, with jurisdiction based on diversity of citizenship. Plaintiffs Elizabeth and Franklin Cyran allege that defendant Sovereign Bank improperly honored disbursement checks issued jointly to plaintiffs and their construction contractor, notwithstanding the fact that the negotiated checks were not endorsed by plaintiffs. Specifically, the Cyrans assert claims for breach of contract and violation of Mass. Gen. Laws ch. 93A.

Sovereign has moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, the motion will be denied.

**I.** *Background*
The following facts are taken as true for the purposes of the present motion.

The Cyrans are citizens of Hardwick, Massachusetts. Sovereign Bank is a federally chartered savings association with a home office in Pennsylvania. *See* 12 U.S.C. 1464.[1]

On June 9, 2003, the Cyrans entered into a construction contract with Yankee–Crafted Homebuilding, Inc., for the construction of a single-family residence in Hardwick. The contract price for the home (subject to additions or deductions via change order) was $247,300.

On July 15, 2003, the Cyrans entered into a mortgage loan agreement with Sovereign in the amount of $225,000 in order to pay for the construction. As part of that agreement, the parties executed a "Loan Advance Schedule." Pursuant to that schedule, there were to be six separate disbursements to Yankee, each made after it reached a specific construction milestone: (1) a $14,795 disbursement upon completion of "excavation, well, footings, foundation walls," (2) a $61,825 disbursement after "first floor joist and decking, frame and sheath exterior walls, interior partitions, exterior doors and windows installed, roof shingled," (3) a $61,825 disbursement after "concrete floors poured, exterior siding, rough electric, rough heating and rough plumbing," (4) a $24,730 disbursement after "fireplace, sheetrock, septic system installed, furnace installed," (5) a $37,095 disbursement after "interior trim, cabinets, painting and staining, finish electric, plumbing and heating," and (6) a $24,730 disbursement after "finish flooring and C.O." (Complt., Ex. A).

The parties also executed a document entitled "Procedures for Construction Loan Payouts" that detailed how mortgage funds would be released. The agreement stated in relevant part:

1. All requests for payouts must be made in writing and forwarded to Sovereign Bank ....

2. Arrangements must be made [with] the Bank's Construction Department to inspect the property.

3. Upon release of a satisfactory inspection report, funds will be released in accordance with our Loan Advance Schedule. Checks will be made payable to the Borrower(s) and the Contractor and mailed to the Contractor. If the Borrower(s) so elects, Borrower(s) may make a written request that the Bank is to issue a check solely in the Contractor's name....

**\*2** (Complt., Ex. B).

*Cyran v. Sovereign Bank, Not Reported in F.Supp.2d (2008)*

On August 12, 2003, Sovereign issued a $22,300 check made payable to both the Cyrans and Yankee. (Complt., Ex. C).[2] This check was mailed to Yankee. Yankee negotiated the check at Fleet Bank and obtained the funds from Sovereign without obtaining the Cyrans' endorsement. On September 25, 2003, Sovereign issued a $61,825 check made payable to both the Cyrans and Yankee. (Complt., Ex. D). This check was also mailed to Yankee, and Yankee again negotiated the check at Fleet and obtained the funds from Sovereign without obtaining the Cyrans' endorsement.[3]

In April 2004, the Cyrans terminated their contract with Yankee, contending that the construction was defective and incomplete. On April 9, and again on May 13, the Cyrans demanded a refund from Sovereign to their loan account in the amount of $61,825 on the grounds that they had not endorsed the September 25 check. On April 27, a Sovereign representative informed the Cyrans that she would file a demand for reimbursement with Fleet Bank, the bank that (apparently) accepted the check for deposit:

> Please be advised that I am preparing and will file with Fleet Bank a demand for reimbursement for the face amount on the check on the basis that two necessary endorsements are missing from the reverse of the check.

(Complt., Ex. E). On May 19, Sovereign informed the Cyrans that Fleet had rejected the demand for reimbursement, and that accordingly Sovereign would not credit the disputed $61,825 to the account.

On December 13, 2004, the Cyrans served upon Sovereign a written demand for relief pursuant to Mass. Gen. Laws ch. 93A.[4] Sovereign disclaimed liability and did not respond with an offer of settlement. On September 21, 2007, the Cyrans filed a complaint against Sovereign in the Superior Court. Sovereign then removed the case to this Court.

## II. *Analysis*

### A. *Standard of Proof*

To survive a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the factual allegations in a complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Gagliardi v. Sullivan,* 513 F.3d 301, 305 (1st Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1966–67, 167 L.Ed.2d 929 (2007)). Dismissal for failure to state a claim is appropriate if the complaint fails to set forth "factual allegations, either direct

or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi,* 513 F.3d at 305 (*quoting Centro Medico del Turabo, Inc., v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir.2005)). The Court need not consider "bald assertions [or] unsupportable conclusions." *Doyle v. Hasbro, Inc.,* 103 F.3 186, 190 (1st Cir.1996).

### B. *Breach of Contract*

Defendant contends that (1) the plaintiffs' common-law breach of contract claim is preempted by the Uniform Commercial Code ("UCC"), and (2) even if the claim is not preempted, the complaint fails to assert a cognizable claim for breach of contract. The Court will consider each theory in turn.

#### 1. *Preemption*

**\*3** Plaintiffs contend they have at least two possible causes of action arising out of Sovereign's honoring of checks with missing endorsements: (1) a conversion claim brought under the UCC and (2) a breach of contract claim brought under the underlying loan disbursement agreement. *See* Mass. Gen. Laws ch. 106, § 3–420(a). Plaintiffs have elected to bring only a breach of contract claim, apparently recognizing that a conversion claim under § 3–420 would almost certainly be time-barred.[5]

Defendant contends that plaintiffs' *only* possible claim arising out of the disputed acts is for conversion, on the grounds that the UCC preempts any common law claim involving a negotiable instrument. Defendant relies on *Jensen v. Essexbank,* 396 Mass. 65, 483 N.E.2d 821 (1985), and *Arkwright Mut. Ins. Co. v. State Street Bk. & Tr. Co.,* 428 Mass. 600, 703 N.E.2d 217 (1998), in support of that argument.

In *Jensen,* the plaintiff opened a checking account with the defendant bank and directed the bank to send the checkbook and all bank statements to the plaintiff's attorney. 396 Mass. at 65–66, 483 N.E.2d 821. The attorney, without plaintiff's knowledge, forged plaintiff's signature and drew multiple checks on the account. *Id.* at 66, 483 N.E.2d 821. The plaintiff brought breach of contract and negligence claims against the bank. The court found that plaintiff had failed to notify the bank of the forged checks within one year from the time that bank statements were available to him, and stated:

The one-year period in § 4–406(4) [of the UCC] is not a statute of limitations which might not start to run until the plaintiff knew or should have known of his attorney's treachery, as the plaintiff argues. It is a statutory prerequisite of notice. It does not govern the time within which an action must be commenced but rather governs the time within which a party to a contract is obligated to act (in this case, give notice to the bank) .... it necessarily follows that the plaintiff's claims in contract and in negligence must fail.

*Id.* at 66–67, 483 N.E.2d 821.

In *Arkwright,* an employee of the plaintiff bank diverted multiple expense reimbursement checks to her own account at defendant bank. 428 Mass. at 601, 703 N.E.2d 217. After the plaintiff bank reimbursed the payees in the amount of the diverted funds, it claimed that the two defendant banks (the depository bank and the drawee bank) were negligent in paying funds to the employee on the basis of the misappropriated checks. *Id.* at 218–219. The court, relying on *Jensen,* held that Mass. Gen. Laws ch. 106, § 4–406(4) barred liability for failure to give timely notice. The court also explicitly noted a distinction between claims brought under the UCC and common-law claims that the UCC might govern only in certain respects:

> ... § 4–406(4) states in broad terms that a bank customer in such circumstances "is precluded from asserting against the bank [an] unauthorized signature." Conspicuously absent from this proscription is any language *limiting preclusion to actions arising under the UCC.* Thus, [the statute] bars the bank's liability regardless of the theory on which the plaintiff relies.

**\*4** *Id.* at 221 (emphasis added).

These cases certainly stand for the proposition that the UCC supplants common-law causes of action as to the prerequisite of notice. *See, e.g., Jensen,* 396 Mass. at 66, 483 N.E.2d 821. They do not, however, compel the conclusion that all common-law causes of action are preempted in all cases involving negotiable instruments. Indeed, nothing in *Jensen* or *Arkwright* states or suggests that the common-law claims were preempted, whether or not the notice requirement had been met.

A more analogous situation was present in *General Motors Acceptance Corp. v. Abington Cas. Ins. Co.,* 413 Mass. 583, 588, 602 N.E.2d 1085 (1992). There, an automobile insurer issued a check payable jointly to the vehicle owner and

GMAC (which held a security interest in the vehicle and was the loss payee under the policy). The owner presented the check at the drawee bank without obtaining GMAC's endorsement. The drawee bank made payment to the owner and the drawer bank then honored the check. The court held that "payment of a check to one copayee without the endorsement of the other copayee does not discharge the drawer [i.e., the insurer] of either his liability on the instrument or the underlying obligation." 413 Mass. at 588, 602 N.E.2d 1085. Accordingly, "because [the insurer's] obligation to [GMAC] as a joint payee is not discharged, [GMAC] ... may sue on the underlying contract claim." *Id.; see also Kenerson v. FDIC,* 44 F.3d 19, 32 (1st Cir.1995) (in dicta characterizing *Abington* as a case that held "... a payee could sue a drawer—under § 3–804 *or on the underlying contractual obligation*—where the instrument was drawn to the plaintiff and a co-payee and the drawer delivered the instrument to the co-payee, who absconded with the plaintiff's funds") (emphasis added). Although this case involves a check issued directly by the drawer bank pursuant to a loan agreement, there appears to be no reason to require a different result. Accordingly, the UCC does not preempt plaintiffs' contract claim on the underlying loan disbursement obligation.

#### 2. *Breach of Contract*

Defendant contends that the breach of contract claim, even if not preempted, is nonetheless not cognizable given the plain text of the disbursement agreement. The first count of the complaint asserts that (1) the loan disbursement procedures form signed by the parties is an enforceable contract, and (2) defendant breached the agreement by "allowing Yankee to negotiate two checks totaling $84,125, without obtaining the Cyrans' endorsement." (Complt., ¶¶ 25–26). Defendant contends that it fulfilled its express contractual duties, and that the contract does not create any obligation to honor or pay a disbursement check that has been negotiated and presented by a depository bank.[6]

Plaintiffs apparently do not dispute that defendant complied with the *express* terms of the "Procedures for Construction Loan Payouts" agreement. Under that agreement, when Sovereign received a "satisfactory inspection report," it was obligated to release loan funds in accordance with the Loan Advance Schedule. (*See* Complt, Ex. A, B). Defendant was further obligated to release funds in the following form: "[c]hecks will be made payable to the Borrower(s) and the Contractor and mailed to the Contractor." (*Id.* at Ex. B). Here,

both disputed checks were made payable to both the plaintiffs and Yankee. (*Id.* at Ex. C, D). Both checks were mailed directly from the defendant to Yankee. (Complt., ¶¶ 13–14). These actions are clearly in accordance with (and required by) the literal language of the disbursement contract.

**\*5** Plaintiffs, however, contend that a breach of contract claim is nonetheless viable because the loan disbursement contract impliedly required defendant to refrain from negotiating loan checks that were not signed by the plaintiffs.[7] It is plaintiffs' burden to establish that the contract contains an implied term. *See Bernard v. Cameron Colby Co.,* 397 Mass. 320, 321, 491 N.E.2d 604 (1986).

> Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties at the time of the execution, in light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished .... [The] instrument is to be so construed as to give effect to the intent of the ... [parties] as manifested by the words used illumined by all the attendant factors, unless inconsistent with some positive rule of law or repugnant to other terms of the instrument. An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention ... may be effectuated, provided it is sufficiently declared by the entire instrument.
>
> *Id.* at 321–322, 491 N.E.2d 604 (*quoting Dittemore v. Dickey,* 249 Mass. 95, 104–105, 144 N.E. 57 (1924)). At this early stage of the proceedings, the Court is unable to state as a matter of law that the loan disbursement contract does *not* impliedly prohibit the defendant from negotiating improperly endorsed checks. The alleged implied term is not explicitly foreclosed by the language of the contract. Under the plain language of the contract, checks were to be made out to both the plaintiffs and Yankee. (Complt., Ex. B). Special permission was required from the plaintiffs before the defendant could write a check payable *only* to Yankee. It is not implausible or unreasonable to contend that these clauses necessarily imply that defendant would later require *both* payee's signatures before it would release money from the loan account. *See, e.g., Gustafson v. Wachusett Regional School Dist.,* 64 Mass.App.Ct. 802, 807, 836 N.E.2d 1097 (2005) (no provision in a contract

should be interpreted in such a way as to render it meaningless).

Such a determination cannot be made on the present record.[8] Plaintiffs accordingly have met their "relatively light burden to maintain a complaint in the face of a Rule 12(b)(6) motion." *Warner–Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 47, 691 N.E.2d 545 (1998).

### C. *Chapter 93A*

In order to state a claim under Ch. 93A, a plaintiff must allege a "pernicious purpose," an "ulterior motive," or a "coercive or extortionate objective." *See, e.g., Framingham Auto Sales v. Workers' Credit Union,* 41 Mass.App.Ct. 416, 418, 671 N.E.2d 963 (1996). The actions of defendant need to fit "within a common law conception of unfairness [and must be] immoral, unethical, oppressive, or unscrupulous" in order to support a Ch. 93A claim. *See, e.g., Govoni & Sons Constr. Co. v. Mechanics Bank,* 51 Mass.App.Ct. 35, 51, 742 N.E.2d 1094 (2001).

**\*6** Here, plaintiffs contend defendant committed "unfair and deceptive acts" when it (1) failed to adhere to the "terms and conditions" of the disbursement contract and honored two checks without plaintiffs' endorsements; (2) admitted its breach of the disbursement contract but offered to reimburse plaintiffs only if the depository bank reimbursed it; and (3) failed to make a reasonable offer of settlement in response to the plaintiffs' demand letter. (Complt., ¶ 29).

Chapter 93A requires more than a mistake or an honest dispute concerning a contract. *See Duclersaint v. Federal Mortgage Ins. Ass'n,* 427 Mass. 809, 814, 696 N.E.2d 536 (1998). Some level of bad faith must be present. *See Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 474, 583 N.E.2d 806 (1991). As to the failure to make an offer of settlement, "mere resistance to a just claim is not the stuff of 93A, except where made so by statute." *Framingham Auto Sales,* 41 Mass.App.Ct. at 418, 671 N.E.2d 963.

Here, as to the first and third grounds, plaintiffs have not pleaded that defendant conducted those acts with a "pernicious purpose," an "ulterior motive," or a "coercive or extortionate objective." *Id.* Breach of contract and refusal to settle, without more, are not *per se* unfair or deceptive acts. *See supra.* As to the second ground, plaintiffs allege the following:

> Sovereign, through its counsel, knowingly refused to credit the Cyrans' loan account unless Sovereign could first

recover said $61,825 from Fleet Bank. Sovereign took this position even though it knew that applicable law clearly provided that because of the passing of more than 30 days from presentment of the check, Sovereign could never succeed in forcing Fleet Bank to reimbursement [*sic* ] Sovereign ....

Sovereign sent Exhibit "E" to two "layperson" consumers, the Cyrans, hoping it would dissuade the Cyrans from exercising their rights versus Sovereign. Exhibit "E" was, in the light most favorable to Sovereign, at best disingenuous, as Sovereign's counsel knew the law and also knew of Sovereign's obligations pursuant to the Procedures Agreement to require the Cyrans' endorsement on any check issued to Yankee and also knew the offer to seek reimbursement from Fleet Bank was without substance.

(Complt., ¶¶ 19–20). The contention that Sovereign lied about seeking reimbursement (or implied that receiving reimbursement from Fleet Bank was possible, when defendant knew it was not possible under any circumstances) states a facially sufficient claim under Chapter 93A. "Doubt or misgivings about whether a claim can be ranked as provable (or even credible) ... is not a proper basis for dismissal of [plaintiffs'] actions under Rule 12(b)(6)." *Wrightson v. Spaulding,* 20 Mass.App.Ct. 70, 72, 478 N.E.2d 141 (1988). The Chapter 93A claim accordingly is sufficient to survive a motion to dismiss.

**III.** *Conclusion*

For the foregoing reasons, the motion of defendant Sovereign Bank to dismiss for failure to state a claim is DENIED.

**\*7  So Ordered.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2510146

Footnotes

1    The defendant is erroneously referred to as "Sovereign Bank New England" in the complaint.

2    The reason for the difference in amount from the Loan Advance Schedule (which called for a first payment of $14,795) is unclear.

3    At some point between August and December 2003, two other checks were also issued by Sovereign pursuant to the mortgage loan. Those checks are apparently not disputed.

4    The Chapter 93A demand letter made reference to two allegedly improperly disbursed checks (for $22,300 and $61,825, respectively). It is unclear from the record whether the Cyrans had informed Sovereign of any problem with the $22,300 check before that point.

5    The limitations period for a claim of conversion of a negotiable instrument is three years after the cause of action accrues. Mass. Gen. Laws ch. 106, § 3–118(g). A cause of action accrues for these purposes when the plaintiffs discover, or reasonably should have discovered, that they have been harmed by the defendant's conduct. *LePage v. Shawmut Bank, N.A.,* 49 Mass.App.Ct. 1119 *1, *2 (2000).

    Here, plaintiffs were aware of the missing endorsement on the $61,825 check no later than April 9, 2004. The record is less clear as to when plaintiffs first became aware (or should have become aware) of the missing endorsement as to the $22,300 check, but they were at least aware in December 2004, when the Chapter 93A demand letter was sent. Plaintiffs filed the complaint on September 21, 2007.

6    For purposes of this motion only, defendant accepts plaintiffs' contention that the "Procedures for Construction Loan Payouts" document signed by the parties is a valid contract. (Deft. Mem. at 3).

7    Plaintiffs also argue in their opposition that defendant made loan disbursements that were not listed in the Loan Advance Schedule. It is true that the Loan Advance Schedule contemplated a first disbursement in the amount of $14,795, and that the actual first disbursement was for $22,300. That theory of liability was not, however, alleged in the complaint. The "Breach of Contract" count of plaintiffs' complaint states:

> "The Procedures Agreement between Yankee, the Cyrans and Sovereign constituted a valid and binding contract .... Sovereign by allowing Yankee to negotiate two checks totaling $84,125 without obtaining the Cyrans' endorsement, breached the terms and conditions of the Procedures Agreement and the Cyrans have been damaged in an amount to be established [*sic* ] trial of this matter."

(Complt., ¶¶ 25–26). Plaintiffs' theory of breach thus rests on defendant's alleged improper honoring of the checks, and not any improper calculation of the correct amounts as required by the Loan Advance Schedule.

8    *Compare Pimental v. Wachovia Mortgage Corp.,* 411 F.Supp.2d 32, 36–39 (D.Mass.2006) (dismissing breach of contract claim because the proposed "implied term" was explicitly contradicted by the plain language of the contract).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.