# **Exhibit 7**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 1:25-cv-11008-WGY

* * * * * * * * * * * * * * * * * * * * * * * * * *

REGEN HORCHOW,

Plaintiff,

vs.

THE WESTMOOR CLUB, LLC,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF REGEN HORCHOW

Conducted Remotely

Friday, March 27, 2026

10:01 a.m. Eastern

Magna Legal Services

866-624-6221



Page 9

directory from The Westmoor Club?

A.   Not in Dallas, no.

Q.   Do you have them somewhere else?

A.   I probably have an old version in our home in Nantucket.

Q.   When you say "our home," who is "our"?

A.   I share 23 Cliff with my ex-husband.

Q.   What is his name for the record?

A.   Jeffrey Fearon.

Q.   From the time that you filed the lawsuit that has brought us all here today, have you spoken to Dr. Fearon about The Westmoor Club?

A.   No.

Q.   What was the date that your divorce from Dr. Fearon was finalized?

A.   Believe it or not, I can't recall.  It was February 20-something, 2020.

Q.   That's close enough.  You've got the month and the year.  February of 2020?

A.   Yes.

Q.   Since the time of the divorce, have you and Dr. Fearon been on Nantucket together at the same time?

A.   No.



would please send it to me.

Q.   Why did you do that?

A.   Because I had signed on to the website and was shocked to see that I was not listed as the primary member.

Q.   Well, why did you sign on to the website?

A.   I don't recall.

Q.   How often did you sign on to the website back in this time period of 2020-2021?

A.   I don't recall ever signing on beyond this one time.

Q.   Well --

A.   Other than to pay the bills.

Q.   Yeah, I was going to ask you that.

So I think you told me earlier you don't remember when you began to pay bills electronically.  But I assume you would do that every time you paid a bill, at least after you decided to start using the website, you would sign on for that purpose; is that correct?

A.   Correct.

Q.   Did you ever sign on to the website for any other purpose; for example, to schedule things



Page 23

at the club, make reservations?

A.    Yes.

Q.    Find out about activities?

A.    I made food reservations, dinner reservations.

Q.    I assume that similar to the transition in bill-paying, that at some point making reservations, you did that via website rather than calling up the club; is that correct?

A.    Yes, I think I did both.

Q.    Okay.  What about any kind of, like, club newsletter, is that something you received in hard copy or did you go online to look at it?

A.    I don't recall.

Q.    And then what about, how often did you go online to look at the membership directory to find out another member's contact information, et cetera?

A.    I don't recall ever doing that.

Q.    Okay.  And the membership directory that you mentioned that you have, and I believe you -- actually your counsel at least produced in this case from 2021, did you print that out from the website?



Page 29

she please change it back to me as the primary.

Q.   You said "change it back to."  Why did you say "back to"?

A.   Because I was admitted to the club.  I was a primary member, so it must have gotten changed at some point and I didn't catch it.

Q.   Do you recall ever seeing a time in any club documents or website that you were listed as the primary member?

A.   I don't recall seeing a designation in any of the club documents with primary or spouse.

Q.   So when you said "change it back," you're telling me that because you filled out the application, you assumed you were the primary member, but you don't ever remember seeing a club listing that got changed?

A.   I don't recall.

Q.   Is there some reason you didn't write that in this e-mail?  Instead of saying, "If it is possible to list me as the primary instead of Jeff," why didn't you say, "Is it possible to change it back to me as the primary?"

A.   I believe I did say that in subsequent e-mails.  At this point, I was trying to be



Page 39

just get the listing changed on the online

website.  I assumed I was the member.  I was

acting as the member.

          And I was merely trying to get my name

changed, and I thought that Kitty, who was there

at the beginning and was involved with -- she was

the reason that we joined the club, that she could

advocate for allowing my name to be changed into

the proper placement on the website.

     Q.   Just so you understand my question.  I

was trying to derive it from your own subject

line, which is, "Need your memory on a membership

question."  Do you see that?

     A.   Yes.

     Q.   In this paragraph here where it starts,

"Jeff and I divorced," and here's where you talk

about your accounting that the club has said it's

okay with a shared membership.

          Oh, I'm sorry, the line before that

was -- you wrote that you still share your house

at 23 Cliff and continue to share the Westmoor

membership.  How long did you think that you had

been sharing the Westmoor membership?

     A.   Well, I didn't think we were sharing it.



Page 45

Q.   So again, it sounds like you're saying what you meant is a little bit different than what you wrote.  So this says, "I [don't] want to make a huge issue out of this," but you're telling me what you actually meant is that you don't think it should be a big issue; is that correct?

A.   Correct.  I did not think it should be a huge issue to change my name to list me correctly with my correct legal name in the correct designation as primary member.

Q.   Did you ask at this time or in your prior conversation with Ms. Cowden, how long Dr. Fearon had been listed as the primary member?

A.   I did not.

Q.   Why are you talking about, "However, should I get into a future legal argument with Jeff about our Nantucket assets," why are you concerned about that?

A.   Because by this point, our relationship had dissolved, and I anticipated difficulty with him and that's why.

Q.   And so when you write, "I believe it important that I be listed as the primary member," you thought that was important because you might



Page 46

be in an argument with Dr. Fearon about who owned what?

A.    No, I thought it was important that I be listed as the member so that if I wanted to use The Westmoor as a bargaining chip with him, I could do so.

Q.    You said you personally paid your father back over time.  How did you do that?

A.    I wrote him a check every year for ten years, or sometimes it would be a transfer of money.  At the end of each year, I reimbursed my dad $12,500 each year.

Q.    And was that paid from this joint account that you had with Dr. Fearon?

A.    I don't recall.

Q.    Later on when you say that he "paid no portion" -- I'm sorry, "he did help pay for the ongoing fees," that's because you're paying out of the joint account that you had; is that correct?

A.    No -- well, yes, he paid -- he paid for our use of the club, the monthly bills, but the money that I reimbursed my dad with was not his money.

Q.    It came from some separate source that



Page 49

the old-fashioned way when I have to.

MR. CHAPMAN:  Hayley, just a little bit more to go through with this document. Do you mind if I finish and then we can take a break or do you want to take a break now?

MS. TRAHAN-LIPTAK:  It's up to Regen.  I'm fine.

MR. CHAPMAN:  That works for you, Ms. Horchow?

THE WITNESS:  Sure.

MR. CHAPMAN:  Not much longer.  We do try to take breaks, you know, approximately every hour or so, just for everybody's sake.

Q.   The very next paragraph you wrote, "I would hope that a change would NOT trigger any communication to anyone."  Why did you write that?

A.   Because I didn't think that changing my name was anything that needed to be, you know, flagged for anyone.  It was just an internal change, just fix the listing the way it should be.

Q.   "Anyone" here, you specifically mean Dr. Fearon; correct?



MAGNA
LEGAL SERVICES

Page 50

A.   Yes.

Q.   And I assume part of your concern was that if he found out about it, he would object?

A.   Maybe.

Q.   And then at the end of that paragraph, you say that this change "doesn't impact the use of our membership in any way."  Why did you write that?

A.   Because, again, I was trying to keep the peace such that Jeff and I could both use the club with our children and carry on so that our family could, you know, have a decent relationship.

Q.   I think according to your testimony, unbeknownst to you, you had been listed as the spouse of the member and that previously had not impacted your use of the club or use of your membership; is that correct?

MS. TRAHAN-LIPTAK:  Objection.

A.   Correct.  I don't know.  I don't know if it impacted my use of the club.  I -- I never knew that I was labeled the spouse.

BY MR. CHAPMAN:

Q.   All you can do is talk about what you experienced or observed.  So you did not



Page 51

experience any impact to your membership from the fact that you were listed as the spouse prior to April of 2021?

        MS. TRAHAN-LIPTAK:  Objection.

    A.   I don't think I did, no.

BY MR. CHAPMAN:

    Q.   Because I assume that if you did, you would have immediately said something; correct?

    A.   Probably.

    Q.   Before we move off this, can you think of any time that, prior to April 2021, you experienced an impact from being listed as the spouse?

        MS. TRAHAN-LIPTAK:  Objection.

    A.   No.

BY MR. CHAPMAN:

    Q.   Sorry.  I think your counsel objected, then I didn't hear your answer.

    A.   No.

    Q.   And then you at the very end of this you very nicely ask if Kitty might be willing to help you with this somewhat delicate matter.  Why did you characterize it as a "somewhat delicate matter"?



Page 52

A.   Because I was worried that if it were brought to Jeff's attention that any changes were being made, that would lead him to believe that he was the member.

Q.   And that would potentially impact the various negotiations that you were having with him at the time?

A.   Correct.

MR. CHAPMAN:  Let's take a five-minute break and come back around 11:16, 17, if that works for everybody.

THE WITNESS:  Sure.

(Whereupon, a recess was taken.)

BY MR. CHAPMAN:  I think we're now ready to look at Exhibit 5.

(Marked Exhibit 5)

BY MR. CHAPMAN:

Q.   Okay, Ms. Horchow.  Do you now see a document that is an e-mail exchange between you and Mr. Cowden from July 13 of 2022?

A.   Yes.

Q.   This is going to be Exhibit 5.  For the record, this is Exhibit 4 from the complaint that your attorney filed in federal court.  I'm going



Page 58

about this paragraph where it says, "Given that our divorce decree is silent on this issue," I take it you didn't think to get any kind of written confirmation from the club that you'd be allowed to share the membership, as you put it, prior to finalizing the divorce?

A.   No.

Q.   And then why did you think that a letter from the club triggering the need for one of us to reapply, why were you afraid that would create a legal battle?

A.   Because it would create a conversation in which the owner of the membership was in question.

Q.   Was there any kind of negative consequence to you from Dr. Fearon having to reapply at the Nantucket Yacht Club?

A.   No.

Q.   Had that already occurred at the time of this communication in July of 2022?

A.   I don't recall the date.

Q.   And then you say that you ask the club to "delay official notice and allow us to maintain the shared membership for another year."  Why were



Page 59

you asking the club to do that?

A.  Because I was hoping to use The Westmoor as a bargaining chip in other issues I had with Jeff.

Q.  Now, earlier you told me in response to one of my questions, you said that I didn't know your ex-husband, was a reason why you didn't just talk to him directly.

Here you're telling the club, "I believe I can discuss the membership situation with Jeff." At the time you wrote that, did you believe that you were going to do that?

A.  I believe that I was going to be able to negotiate with him and get to some resolution.

Q.  What were his bargaining chips in that negotiation?

MS. TRAHAN-LIPTAK:  Objection.

A.  We were having discussion -- at that point it was about our house in Dallas.

BY MR. CHAPMAN:

Q.  In your mind, was there a scenario where this negotiation would result in Dr. Fearon being the primary member of The Westmoor Club?

A.  Well, I don't know.  I was going to try



Page 60

and use it as a bargaining chip and I don't know what the outcome of that would have been.

Q.   But having just lost some money in poker last night, I'm very familiar how chips are used.

So was there a scenario with -- in your mind, where Dr. Fearon might have ended up with that chip, of being a member of The Westmoor Club?

A.   I don't know.

Q.   It's possible it's a bargaining chip, it suggests, when you use that term, it's something you might be willing to trade away for something in exchange.

A.   I thought it was something that I could use in that way.

Q.   Okay.   In fact, the next line you say, the nature of this discussion is you're going to "determine which of us will keep it and resolve the issue between us without a legal battle and without involving the club."   That's what you meant; correct?

A.   Yes.

Q.   How soon after this e-mail did this discussion that you said you were going to have occur?



Page 66

agree that you're the primary member, they'll gladly switch that.  So I'm wondering why you've never obtained that agreement from him.

A.    Because I don't believe it was his decision to make.  The club needed to tell me who was the admitted member.

Q.    And what you said is not -- you wanted to make sure the club did not tell him that; right?

A.    No.

Q.    We can go back and look at it again. You said you wanted to make sure it wouldn't trigger a communication with Dr. Fearon.

A.    I didn't say I would make sure.  I just said I didn't think it would be productive.

Q.    So you're saying, your testimony under oath right now, that you don't know whether Dr. Fearon agrees with you that you're the primary member?

A.    I do not know that.

Q.    And you've done nothing to determine the answer to that question in the five years since you learned that he was not -- that he was listed as the primary member?



A.   I have done nothing to determine his point of view, no.

Q.   And you've not learned that from any source?

A.   I believe there was a correspondence from him, there was a correspondence in which I confirmed my understanding of his point of view. So yes, my understanding of his point of view at some point was that he believed he was the member.

Q.   And you've testified that one way this all could have been resolved in your mind would have been if the club had written to you and said, "We're going to change this so that you're the primary member"; right?

MS. TRAHAN-LIPTAK:   Objection.

A.   I wasn't asking the club to change that I was the primary member. I was asking the club to change the way it was displayed in the portal that I was the primary member because I believe that I was the primary member. So I wasn't asking the club to change that. I was asking them to change how they listed it.

BY MR. CHAPMAN:

Q.   Right, and did you think that the club



Page 71

the opposite point of view.

Q.   I think you've told me you never actually asked him.

A.   At this point, I have not asked him, no.

Q.   And never did?

A.   I never asked him directly who he believed was the member, no.

Q.   Okay.  Let's look at the e-mail above this.  These e-mails are in a really -- this is now continuing on with this same exhibit, 6.  This is the document with the Bates number ending in 42 on the bottom.  This is a few days later.  An e-mail from you to Mr. Cowden.

MS. TRAHAN-LIPTAK:  If I can just pause for a moment, Tyler, to clarify what Exhibit 6 is.  The Bates range ends 42. What is the start of the Bates range?

MR. CHAPMAN:  It's 41 to 44.

MS. TRAHAN-LIPTAK:  Thank you.  And if you can just show Ms. Horchow where we're starting.

BY MR. CHAPMAN:

Q.   It's a little bit confusing.  This is Exhibit 6, and it's the page that ends in 42.  And



Page 77

you say, "If, after negotiating with Jeff, I retain the membership," you'll drop the "Fearon" part?

A.    Correct.

Q.    Were the negotiations, were they underway yet or were you waiting to find out the answer before you begin the negotiations?

A.    I had nothing to negotiate with him until I knew who the member was.

Q.    Because if it were still listed on the website that it was Dr. Fearon, that you wouldn't have that as a bargaining chip?

A.    Correct.

Q.    Okay.  And then there's a response the next day from Mr. Cowden to you and copying Ms. Goldsmith.  The club here is saying, "We don't want to make a change without a signed agreement between you and Mr. Fearon."

Did you understand why the club would want to make sure that Mr. Fearon was aware that they were making this change?

A.    No.

Q.    Did it occur to you that if Dr. Fearon were notified of this change that he would



Page 124

I, Cynthia A. Powers, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 27th day of March, 2026, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge concerning the matters in controversy in this cause; that they were examined upon their oath, and their examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 7th day of April, 2026.

Cynthia A. Powers, Notary Public

My Commission expires May 8, 2031



MAGNA
LEGAL SERVICES