# **Exhibit 16**



# Transcript of John Cowden, Jr.

**Date:** March 26, 2026
**Case:** Horchow -v- The Westmoor Club, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

which is used for, you know, future communications to membership, electronic communications to membership, recordkeeping of their charges, billing, and the like.

Q. Is that a specific software that you use?

A. Yes. It's called Clubessentials. It's a very popular club software system.

Q. (Inaudible.)

A. I'm sorry?

Q. When did the club begin using Clubessentials?

A. I honestly don't know. My wife arrived here as the CFO ten years ago. I've been here seven. I believe the system was in place well before her start.

Q. Do you know if Clubessentials was in use from the inception of The Westmoor Club?

A. Oh, no. I don't think automation like that was a thing then in 2024 -- in 2004. Excuse me.

Q. Do you know how Westmoor's records that existed prior to the implementation of Clubessentials were entered into Clubessentials?

A. I'm sorry. You broke up a little bit there.

Q. Sure.

time, but I can tell you today it's -- it's -- it likely would have been our director of membership or our CFO or a combination of the two.  But, again, I don't know when they acquired it and who did the input at that time.

Q. So you said you reviewed Clubessentials as part of your preparation?

A. In a very small way, I suppose I did. Again, just looking at how it was set up in the system.  It was a brief review.

Q. Do you know if The Westmoor has identified documents from Clubessentials as part of their document production?

A. I believe that statements, activity while they were members was provided.  But beyond that, no.

Q. What type of information is available in Clubessentials when you log into the software?

A. What kind of information?  So, again, the member account, who the primary member is, who the spouse is, members of the family who are each given membership account numbers, again, any chips that might have been signed at a food and beverage outlet or in our wellness center for spa services, guest

charges, perhaps a stay at the clubhouse.  Really accounting information.

Q. Do members have access to Clubessentials?

A. Yes, either through the website or an app.

Q. What type of information is available to -- for a member to view when they access Clubessentials?

A. Their account.  Nobody else's account. Their own account, activity calendars, event calendars.  There's an online membership directory which reflects our paper directory.  Yes.

They also have the ability to make reservations for various activities, including dining, when using the app or the online system.

Q. Backing up just a moment, we got to document collection too quickly.

Can you tell me about your position at The Westmoor?  What is that position?

A. I am the general manager.

Q. And how long have you been at The Westmoor?

A. I was hired in October of 2019.

Q. Can you tell us about your job responsibilities as the general manager?

A. I'm responsible for the oversight of the

Are memberships from expelled members resold?

A. Are they resold?  Yes.

Q. Has the membership that is the subject of this dispute been resold?

A. Yes.  We are still currently at 580 memberships, so yes.

MS. TRAHAN-LIPTAK:  Can we go to page 15, please.  Actually, we already discussed that, so maybe go to page 11.

Q. What is the club's policy, in the event of a member divorce, as to who maintains the membership?

A. In separation or divorce, the membership continues to be held by the primary member.

Q. And how do you determine who that primary member is?

A. We know from the application who signed as primary, who the primary is and how it was set up in the system.

Q. You said you know from the application.

Is that what your membership policy says, that it was based upon who signed as the primary?

MS. HUGGAN:  Objection.

A. I don't know if it says that specifically.

with Regen Horchow.

Q. Up until that time, was Ms. Horchow a member in good standing at the club?

A. Yes.  Both Dr. Fearon, Ms. Horchow, and their children were in good standing.

Q. What do you recall of when Ms. Horchow first contacted the CFO of the club?  What was the substance of that request?

A. She -- she was asking our CFO to change the name -- change the name on the membership -- change the primary name on the membership from Dr. Fearon to her.

Q. What was the club's response?

A. We won't do that.  We won't do that. Dr. Fearon has been listed as the primary member, and maybe in that communication or other communications, we're not going to do that without -- certainly without Dr. Fearon's permission or involvement.

Q. At that point, did you review your records to determine when Dr. Fearon was first listed as the primary member?

A. We looked at the application and sure noticed that Regen Horchow, it would appear, started

the application.  But then her husband at the time, Dr. Fearon, signed as the applicant.  And given that, we were not going to simply change it into her name.

Again, we don't -- we don't get involved with disputes.  And so we gave them opportunity to figure it out on their own and then let us know if there should be a change.

Q. Did you look at any documents or files to determine who the club had admitted as a member?

A. Just what existed in the file.  But we had been working on -- I can't even call it an assumption.  But when we came on board, we inherited what existed, and that is in our system, Dr. Fearon is listed as the primary member, so that's what we're working off of.  And as stewards of this club, protecting our membership, our members, our owners, we weren't simply going to make a change like that without hearing from both parties.

Q. You didn't review any compilations of member rosters prior to the club -- adoption of the Clubessentials software?

A. No.

Q. And there weren't any listings available of

Q. Do you recall discussing the membership -- who owned the membership with anyone else at the club in July of 2023?

A. I don't recall having a conversation with anybody else at the club other than my wife, our CFO, and probably Kitty Goldsmith.

Q. In those conversations, did you take a position as to who owned the membership?

A. No.  We didn't take a position because things were as they were.  He signed as the applicant, and it was in the system that he was the primary membership.  So I guess you could say we took a position that, based on all of that, he was the primary member.

Q. So your position, in July of 2023, was that Mr. Fearon was the primary member?

MS. HUGGAN:  Objection.

You can respond.

A. Yeah, again, I -- I don't really know how to answer that, only to say, given everything, he was the primary, and we certainly weren't going to change anything unless there was a court order or an agreement between the two.

Q. At some point after this, Ms. Horchow filed

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 1st of April, 2026.

_____

My commission expires:

February 28th, 2028