# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 1:25-cv-11008-WGY

* * * * * * * * * * * * * * * * * * * * * * * * * *

REGEN HORCHOW,

Plaintiff,

vs.

THE WESTMOOR CLUB, LLC,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF REGEN HORCHOW

Conducted Remotely

Friday, March 27, 2026

10:01 a.m. Eastern

Magna Legal Services

866-624-6221



Page 2

A P P E A R A N C E S

Hayley Trahan-Liptak, Esquire

K&L Gates, LLP

One Congress Street, Suite 2900

Boston, Massachusetts 02114

hayley.trahan-liptak@klgates.com

Representing the Plaintiff

Tyler E. Chapman, Esquire

Meghan E. Huggan, Esquire

Todd & Weld LLP

One Federal Street, 27th Floor

Boston, Massachusetts 02110

tchapman@toddweld.com

mhuggan@toddweld.com

Representing the Defendant



Page 3

I N D E X

                                                        Page

Examination by Mr. Chapman                            5, 121

Examination by Ms. Trahan-Liptak                        113


                         E X H I B I T S

                          (Attached)

Number                                                  Page

Exhibit 1      Membership Application                    15

Exhibit 2      E-Mail, Horchow to Cowden,               20

               4/6/2021

Exhibit 3      E-Mail, Horchow to Cowden,               31

               4/7/2021

Exhibit 4      E-Mail Chain, Goldsmith to               36

               Cowden, 7/5/2022

Exhibit 5      E-Mail Chain, Horchow to                 52

               Cowden, 7/13/2022

Exhibit 6      E-Mail Chain, Horchow to                 69

               Cowden, 2/1/2023

Exhibit 7      E-Mail Chain, Cowden to                  75

               Horchow, 7/22/2022

Exhibit 8      E-Mail Chain, Cowden to                  88

               Horchow, 7/13/2023



Page 4

EXHIBITS

(Continued)

| Number | | Page |
|---|---|---|
| Exhibit 9 | Statements from 2019 | 97 |
| Exhibit 10 | Statements from 2013 | 102 |
| Exhibit 11 | Letter, Fearon to Chapman, 5/23/2025 | 102 |
| Exhibit 12 | Expulsion Letter, 10/10/24 | 105 |



Page 5

P R O C E E D I N G S

REGEN HORCHOW

having been satisfactorily identified

and duly sworn by the Notary Public,

was examined and testified as follows:


DIRECT EXAMINATION


BY MR. CHAPMAN:

Q.    Good morning, Ms. Horchow.

A.    Good morning.

Q.    My name is Tyler Chapman.  I represent The Westmoor Club.  At the very beginning of this deposition, I'm going to just briefly put on the record a few things that we call the "usual stipulations," and I'll try to explain them to you as we go.

The first one is that there's going to be a transcript prepared of this deposition.  The reason that's important to you is that our audience here is the court reporter, Ms. Powers.  So we have to make sure we let each other finish the questions and try to create a clear record and give verbal answers.



Page 6

You will have 30 days to review that transcript, and you'll have an opportunity to note any errors that you have.  If you need more time, just let your attorney know and we're happy to accommodate you.

There's a requirement that you have your signature on that transcript notarized, which we're happy to waive as long as you sign under the pains and penalties of perjury.

And then the last thing is that your counsel and I will agree that all objections, except to the form of my questions, can be reserved until the time of trial.

And what that means for you, Ms. Horchow, is, as I said earlier, we have to let each other finish because I may ask a question, your attorney may want to put an objection on the record.  And then unless she instructs you not to answer, you can go ahead and answer the question.

MR. CHAPMAN:  Ms. Trahan-Liptak, is that all acceptable in terms of stipulations?

MS. TRAHAN-LIPTAK:  That's all acceptable to me.



Page 7

MR. CHAPMAN:  Thank you.

Q.    Ms. Horchow, are you in Texas at the moment?

A.    I am.

Q.    Is that where you live full-time?

A.    It is.

Q.    Are you employed anywhere outside the home currently?

A.    Yes, I work for The Hirsch Foundation.

Q.    Very briefly, what are your responsibilities for The Hirsch Foundation?

A.    I manage a portfolio of about $20 million, and I distribute about 2 million a year to nonprofits.

Q.    This is just a yes-or-no question.  Did you do anything to prepare for your deposition today?

A.    I spoke with my attorney, yes.

Q.    Okay.  Apart from speaking to your attorney, did you do anything else to prepare for your deposition today?

A.    I reviewed the materials.

Q.    Do you have documents in your possession concerning The Westmoor Club?


MAGNA
LEGAL SERVICES

Page 17

Q.   Were you a member of the Park House Club during your marriage to Dr. Fearon?

A.   No.

Q.   Incidentally, are you currently married?

A.   No.

Q.   So if we look at the -- this is now the page of Exhibit 1 that is with a Bates stamp number ending in 22.  Do you see the section here where it says, "Please CHECK the appropriate box below for correct mailing instruction"?

A.   I do.

Q.   Why did you fill this out that way, "Dr. & Mrs. Jeff Fearon"?

A.   Because that's how we received bills during our marriage.

Q.   So even things other than The Westmoor Club, you'd receive bills addressed in this fashion?

A.   Some, yes.

Q.   Do you remember if you had a reason why you didn't just list yourself?

A.   No.

Q.   At the bottom of this same page that has the Bates range ending in 22, there's some


MAGNA
LEGAL SERVICES

Page 18

signatures.  Why did you sign on this "Spouse Signature" line?

A.   I don't recall why I signed on the signature -- I -- I don't know.  Obviously, it was an error.

Q.   Is that the same answer you'd give if I ask why Dr. Fearon signed on the "Applicant" line?

A.   Yes, I filled out the form.  I turned it around -- I, subsequently when he came to the island, handed it to him to sign.  I didn't tell him what line to sign on.  I didn't pay attention.  And then I co-signed it.

Q.   Do you have a memory of the moment you have just described where you had him sign this application?

A.   Vaguely.

Q.   Anything else?  Well, what you testified to, is that something you actually remember or is that something you assume happened?

A.   No, I remember that I completed the application while he was not on island, and when he arrived on island, I asked him to sign it and then I co-signed it.

Q.   Do you have a specific memory of asking



Page 23

at the club, make reservations?

A.    Yes.

Q.    Find out about activities?

A.    I made food reservations, dinner reservations.

Q.    I assume that similar to the transition in bill-paying, that at some point making reservations, you did that via website rather than calling up the club; is that correct?

A.    Yes, I think I did both.

Q.    Okay.  What about any kind of, like, club newsletter, is that something you received in hard copy or did you go online to look at it?

A.    I don't recall.

Q.    And then what about, how often did you go online to look at the membership directory to find out another member's contact information, et cetera?

A.    I don't recall ever doing that.

Q.    Okay.  And the membership directory that you mentioned that you have, and I believe you -- actually your counsel at least produced in this case from 2021, did you print that out from the website?



Page 24

A.   No.

Q.   So that was a physical copy you just had; is that correct?

A.   Correct.

Q.   Okay.  So you said that when you found that, I guess, I think you told me Dr. Fearon, you said you were shocked to see that he was listed as the primary member; is that correct?

A.   Correct.

Q.   Was the time that you looked on the website and discovered that, was that close in time to April 6th of 2021?

A.   Yes.

Q.   What were -- do you recall what you were looking at that gave you this information that he was listed as primary?

A.   I, for some reason, thought I would just go check and see how we were listed.  I think it probably had to do with wanting to change my name from Fearon to Horchow.

Q.   So in the year and a couple months between your divorce being finalized in February of 2020 and this time you visited the website in April of 2021, how were you and Dr. Fearon using



Page 29

she please change it back to me as the primary.

Q.    You said "change it back to."  Why did you say "back to"?

A.    Because I was admitted to the club.  I was a primary member, so it must have gotten changed at some point and I didn't catch it.

Q.    Do you recall ever seeing a time in any club documents or website that you were listed as the primary member?

A.    I don't recall seeing a designation in any of the club documents with primary or spouse.

Q.    So when you said "change it back," you're telling me that because you filled out the application, you assumed you were the primary member, but you don't ever remember seeing a club listing that got changed?

A.    I don't recall.

Q.    Is there some reason you didn't write that in this e-mail?  Instead of saying, "If it is possible to list me as the primary instead of Jeff," why didn't you say, "Is it possible to change it back to me as the primary?"

A.    I believe I did say that in subsequent e-mails.  At this point, I was trying to be



MAGNA
LEGAL SERVICES

Page 30

collaborative and I assumed that it wouldn't be an issue since all the things we know; the application is in my handwriting, the check is from my family.  I couldn't have dreamed that it would ever be an issue.

Q.    Well, although you do then say -- you must have thought it might cause an issue because you said if it does cause an issue, "then don't worry about it."  Why did you say that?

A.    Just because I was trying to be cooperative.

Q.    When you wrote, "I don't want to stir anything up or be difficult," did you have some thought that this question might stir things up?

A.    At this point, I was reacting to, merely, how my name was listed and not to the ramifications of what that meant.  So changing how my name was listed, I could be flexible on.  I was not reacting to what subsequently became the issue, that my membership was in question.

Q.    Yes, understood.  Obviously, you can't react to something that hasn't happened yet. That's what I was -- that's why I'm trying to focus on what was in your mind in -- on April 6th


MAGNA
LEGAL SERVICES